1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

JAMES WILSON, an individual,
10  and JACK WHITE and RITA
WHITE, a married couple,
11  on behalf of themselves
and all others similarly
12  situated,

13                                  NO. CIV. S-12-0568 LKK/GGH
          Plaintiffs,
14
     v.
15                                      O R D E R
METALS USA, INC., a Delaware
16  Corporation; and DOES 1-100,
inclusive,
17

18        Defendants.
_____/
19

20      Jack Wilson, Jack White, and Rita White are the named

21  plaintiffs in this putative consumer class action, which seeks

22  damages for defective home roofing tiles.[1]

23      Plaintiffs had previously named Metals USA, Inc. ("Metals

24  USA") and Allen Reid as defendants in this action. Both defendants

25  _____

26        [1] No class certification hearing has been held yet.

                               1

filed motions to dismiss plaintiffs' First Amended Complaint, which the court ultimately granted. The court also granted plaintiffs leave to amend their complaint, as well as to conduct limited discovery in support of their allegations of successor liability against Metals USA.

Plaintiffs' Second Amended Complaint ("SAC", ECF No. 49) alleges four causes of action, exclusively against Metals USA: (1) breach of written warranties under the federal Magnuson-Moss Warranty Act, (2) breach of express warranties, (3) violations of California's Consumer Legal Remedies Act, and (4) violations of Cal. Bus. & Prof. Code § 17200.

Metals USA moves to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6).[2]

The motion came on for hearing on August 26, 2013. Having considered the matter, for the reasons set forth below, the court will deny Metals USA's motion.

# I. BACKGROUND

## A. Factual Background

### 1. Dura-Loc and the Tiles

In 1984, Dura-Loc Roofing Systems Limited ("Dura-Loc") was founded in Ontario, Canada. Former defendant Allan Reid served as Dura-Loc's President, as well as a member of its Board of Directors. (SAC 7.) Dura-Loc's business was designing, engineering, developing, manufacturing, marketing, and selling stone-coated

---

[2] Hereinafter, the term "Rule" refers to the applicable Federal Rule of Civil Procedure.

1  steel roof shingles. (SAC 2, 7.)

2      The present lawsuit concerns alleged defects in certain
3  product lines of shingles which Dura-Loc sold under the names
4  "Continental," "Shadowline," and "Wood Shake" (collectively, the
5  "Tiles"). (SAC 2.) The Tiles were coated with "Colorquartz"-brand
6  granules manufactured by 3M Corporation. (SAC 9.) These granules
7  are translucent, thereby allowing ultraviolet ("UV") rays to
8  penetrate to the surface of roofing tiles. (Id.) As a result, the
9  bonding material used to attach the Colorquartz granules to the
10  Tiles deteriorates, degrades and/or erodes; the granules eventually
11  detach from the Tiles, leaving a bare metal surface. (SAC 10-11.)
12  Plaintiffs term this process the "degranulation defect." (Id.)
13  According to plaintiffs, the degranulation defect manifests only
14  after several years of exposure to UV radiation from sunlight. (SAC
15  11.)

16      In a letter dated January 29, 1993, 3M warned Dura-Loc of the
17  unsuitability of Colorquartz as a surface coating for roofing
18  tiles. (SAC 9.) This warning was reiterated in a technical bulletin
19  released by 3M, dated January 1995, which stated that Colorquartz
20  "is not suitable for applications that require protection of a
21  substrate material from ultraviolet exposure." (SAC 10.)

22      Despite 3M's warnings, Dura-Loc continued to manufacture and
23  sell Tiles covered with Colorquartz granules until May 12, 2006.
24  (SAC 2, 9.) Between July 1, 1995 and May 12, 2006, Dura-Loc offered
25  a warranty with the Tiles which provided substantially as follows:

26      That, for a period of 50 years following proper

installation, the Dura-Loc Product will be free of
manufacturing defects . . . .

*****

That, for a period of 25 years following proper
installation, the surface coating of the Dura-Loc
Product will be UV resistant and will not deteriorate to
the extent the appearance of the roof is substantially
affected . . . . (SAC 8.)

Plaintiffs maintain that, on average, approximately eight years
elapses between an installation of the Tiles and the filing of a
warranty claim on that installation. (SAC 11.)

In the early 1990's, Dura-Loc began expanding into
international markets, including the United States. To assist with
this expansion, Dura-Loc utilized the services of one Andrew
Spriet, who was experienced in export marketing. Spriet was also
a member of Dura-Loc's Board of Directors. (SAC 7-8.) By 1997, 80%
of Dura-Loc's production was exported to the United States, the
majority of it to California. (SAC 8.)

**2. Named plaintiffs**

On or about June 2004, plaintiff James Wilson, a resident of
Roseville, California, and plaintiffs Jack and Rita White,
residents of Orangevale, California, purchased Tiles through All
American Roofing, Inc., a reseller of the Tiles. All American
Roofing provided Wilson and the Whites with sales materials that
were written and approved by Dura-Loc, which Dura-Loc distributed
in order to market, advertise, and sell the Tiles. These sales
materials represented that, for a period of 25 years after
installation, the Tiles would be UV-resistant and that their

appearance would not deteriorate so as to substantially affect roof appearance. These representations also appeared in the express written warranty that accompanied the Tiles. (SAC 4, 5.)

Both Wilson and the Whites purchased the Tiles in reliance on these representations. (Id.)

On or about April 2009, the Whites noticed for the first time that the Tiles they had purchased for their roof were deteriorating. Specifically, the Tiles were losing their stone coating, granular texture, and aggregate and acrylic coating. As of the time of the filing of the SAC, the Whites' tiles had lost most of their original color, coating, and texture. (SAC 6.)

On or about June 2011, Wilson noticed for the first time that the Tiles he had purchased for his roof were deteriorating, losing their stone coating, granular texture, and aggregate and acrylic coating. As of the time of the filing of the SAC, Wilson's tiles had lost most of their original color, coating, and texture. (SAC 5.)

Dura-Loc at no time disclosed to plaintiffs that the Tiles were not UV-resistant and that they contained an inherent defect. (SAC 4, 5.)

### 3. Metals USA's purchase of Dura-Loc assets

In May 2006, defendant Metals USA, a Delaware corporation with its principal place of business in Florida, purchased all of Dura-Loc's assets for $9.4 million. (SAC 14.) This price was nearly $1.6 million less than Dura-Loc's sales for 2005 and nearly $2.1 million less than its projected sales for 2006. (Id.)

1    According to the terms of the asset purchase agreement
2  ("Purchase Agreement"), Metals USA and Dura-Loc would jointly
3  administer a warranty program and share "Warranty Costs" (a defined
4  term in the Purchase Agreement) thereunder. (SAC 14-15.) Sharing
5  of Warranty Costs was governed by a grid, under which Metals USA
6  would cover 100% of the costs between $0 and $65,000.00 in annual
7  claims, 75% of costs between $65,000.01 and $130,000.00, 50% of
8  costs between $135,000.01 and $195,000.00, 25% of costs between
9  $195,000.01 and $260,000.00, and 0% of costs above $260,000.00, for
10  a maximum annual liability of $161,000.00. Dura-Loc would
11  correspondingly cover 0% of costs between $0 and $65,000.00 in
12  annual claims, 25% of costs between $65,000.01 and $130,000.00, 50%
13  of costs between $135,000.01 and $195,000.00, 75% of costs between
14  $195,000.01 and $260,000.00, and 100% of costs above $260,000.00.
15  In other words, Dura-Loc's annual warranty liability had no maximum
16  value. (SAC 15.)

17    After the asset sale, Dura-Loc ceased manufacturing,
18  marketing, and selling the Tiles. (SAC 16.) Metals USA created a
19  wholly-owned subsidiary known as Metals USA Building Products
20  Canada, Inc. ("Metals Canada"), which does business as Allmet
21  Roofing Products. (Id.) This subsidiary changed the stone coating
22  and the basecoat used on the Tiles. (Id.)

23        **4. Warranty handling after the asset purchase**

24    Allan Reid was hired by Metals USA to investigate and decide
25  whether to pay warranty claims. (SAC 18.) Plaintiffs allege that
26  this arrangement created a conflict of interest, since monies

6

1  required to be paid by Dura-Loc would decrease Reid's share of the
2  purchase price or have to come directly from Reid himself. (Id.)

3      Metals USA subsequently discovered that Dura-Loc was failing
4  to honor warranty claims made both before and after the asset sale.
5  (SAC 18.) For example, as of April 26, 2007, only $96,121.97 had
6  been paid out on warranty claims made in 2006, leaving
7  $1,791,184.13 in unpaid claims. (Id.) Of the amount that was paid,
8  $64,000.00 had come from Metals USA, as required by the Purchase
9  Agreement. (SAC 19.)

10      According to plaintiffs, Allan Reid was formulating reasons
11  to delay and/or deny legitimate warranty claims if he, Andrew
12  Spriet, or Dura-Loc would be required to contribute payment under
13  the Purchase Agreement's cost-sharing arrangement. (SAC 19.)

14      On or about June 1, 2007, Metals USA entered into a settlement
15  agreement with Dura-Loc, Reid, and Spriet ("Settlement Agreement").
16  The Settlement Agreement addressed Metals USA's charges that,
17  during purchase negotiations, Dura-Loc had significantly
18  misrepresented the number of customer complaints and warranty
19  claims it faced, the costs of the warranty claims it did disclose,
20  and the extent of the degranulation defect in the Tiles. (SAC 17,
21  20.) Relevant terms of the Settlement Agreement include:

22      •    Dura-Loc's assumption of sole responsibility for
23          "handling and resolving" outstanding, pending, and
24          future warranty claims.

25      •    A one-time payment of $450,000 (CDN) from Dura-Loc to
26          Metals Canada.

1        • Dura-Loc, Reid, and Spriet's release of Metals USA from
2          various obligations in the Purchase Agreement, including
3          responsibility for Warranty Costs.
4        • Metals USA's release of Dura-Loc, Reid, and Spriet from
5          liability for certain misrepresentations and
6          nondisclosures. (SAC 20-21.)
7    Despite the Settlement Agreement's terms, Dura-Loc continued to
8    fail to respond to and satisfy warranty claims made on the Tiles.
9    (Id.) Metals USA and Metals Canada repeatedly communicated with
10   Dura-Loc regarding these failures. (SAC 22-23.) Plaintiffs allege,
11   "The fact that Dura-Loc had approximately $9,000,000 available to
12   pay warranty claims but consciously chose, at every turn, to refuse
13   to pay these claims is further evidence of Dura-Loc's fraudulent
14   transfer to Metals USA in an effort to avoid its obligations under
15   the Warranty." (SAC 24.)
16        Eventually, on April 26, 2011, Metals USA filed suit against
17   Dura-Loc, Reid, and Spriet in the Ontario Superior Court of
18   Justice. (SAC 23, 35.) Damages alleged included lost sales, injury
19   to Metals USA's reputation and goodwill, and legal costs. (SAC 35.)
20   A little over a month later, the parties entered into a First
21   Amendment to the Settlement Agreement. According to the Amendment's
22   terms, *inter alia*, Metals USA received a payment of $845,055.75
23   (CDN), and Reid and Spriet were released from their liabilities
24   under the Purchase Agreement and the Settlement Agreement. (SAC 36-
25   38.)
26        On or about April 2012, 604471 Ontario, Inc., Dura-Loc's

                                    8

successor corporation, filed for bankruptcy in the province of Ontario. In its bankruptcy filing, the corporation represented that it had assets totaling $56,265 and liabilities totaling approximately $2,000,000. (SAC 24.) Its bankruptcy filings show that between 2008 and 2011, the firm received 684 warranty claims. (Id.)

### 5. Allegations regarding Metals USA's involvement

Plaintiffs contend that Metals USA assisted Dura-Loc in defrauding Tile purchasers in the following ways:

- In performing due diligence prior to its purchase of Dura-Loc's assets, Metals USA learned that the overwhelming majority of warranty claims on the Tiles were due to the degranulation defect.

- Due diligence also revealed that the rate of warranty claims was substantially increasing as time went on.

- Due diligence materials included independent expert reports provided to Dura-Loc as part of pre-litigation communications in a case, filed in Texas state court, entitled Darby v. Dura-Loc Roofing Systems, et al. These reports allegedly describe the degranulation defect.

- Due diligence materials included communications from 3M to Dura-Loc regarding the unsuitability of Colorquartz as a roofing material, produced in a lawsuit entitled Weiss v. Dura-Loc Roofing Systems, Ltd., filed in California state court.

- Metals USA initially intended to make a stock purchase

1   of Dura-Loc, but switched to an asset purchase in order
2   to avoid exposure to future liabilities.

3   • Metals USA paid inadequate consideration for Dura-Loc's
4   assets to satisfy Dura-Loc's creditors, *i.e.*, warranty
5   claimants.

6   • Metals USA sought to limit its exposure to warranty
7   claims on the Tiles in the Purchase Agreement.

8   • After purchasing Dura-Loc's assets, Metals USA learned
9   of Dura-Loc's, Reid's, and Spriet's failures in handling
10  warranty claims, but nevertheless further limited its
11  exposure to future claims in the Settlement Agreement.
12  (SAC 25-33, 38-43.)

13      **6. Allegations not made by plaintiffs**

14      Plaintiffs do not allege that Metals USA continued to
15  advertise, market, sell, or warrant the Tiles after purchasing
16  Dura-Loc's assets.

17      Plaintiffs do not allege that the defects in the Tiles caused
18  damage to any property other than the Tiles themselves.

19      Plaintiffs do not allege that the defects in the Tiles caused
20  injury to any person.

21      The court now turns to the procedural history of this action.

22      **B. Procedural Background**

23      On March 5, 2012, plaintiffs filed this action against 604471
24  Ontario and Reid. (ECF No. 1.) Two months later, plaintiffs amended
25  their complaint to omit 604471 Ontario as a defendant, and to add
26  Metals USA in its place. (First Amended Complaint, ECF No. 11.)

1    Reid moved for dismissal under Rule 12(b)(2), arguing that the

2   court lacked personal jurisdiction over him. (ECF No. 22.) The

3   court initially determined that it could not exercise personal

4   jurisdiction over Reid under theories of physical presence,

5   domicile, consent, or general personal jurisdiction (due to

6   "substantial" or "continuous and systematic" activities in

7   California), but requested further briefing from plaintiffs and

8   Reid on the following questions:

9    1. Can the court exercise personal jurisdiction over an
     individual shareholder and officer of a corporation
10   (Reid) under an alter ego theory if the corporation
     itself (Dura-Loc, and later, 604471 Ontario) is not a
11   party to the action?

12   2. If the corporation is in fact a necessary party, may
     Dura-Loc's actions be imputed to 604471 Ontario for
13   purposes of the exercise of personal jurisdiction?
     (Order, October 12, 2012 ("Oct. 12 Order") 28-9, ECF
14   No. 31.)

15  After reviewing the parties' briefs, the court concluded that

16  604471 Ontario was a required party in the action under plaintiffs'

17  alter ego theory, and that in the firm's absence, the court could

18  not exercise personal jurisdiction over Reid. (Order, November 27,

19  2012, ECF No. 34.) The court dismissed, but granted plaintiffs

20  leave to amend to name both 604471 Ontario and Reid as defendants.

21  Plaintiffs chose not to proceed against them, as neither is named

22  as a defendant in the operative Second Amended Complaint.

23   Metals USA also moved for dismissal of the First Amended

24  Complaint under Rule 12(b)(6), arguing that it could not be held

25  liable for Dura-Loc's fraud. (ECF No. 15.) Relying on an

26  unpublished California appellate decision, the court determined

1   that California law will support a finding of successor liability

2   due to fraudulent transfer where the fraud is evidenced by

3   inadequate consideration. (Oct. 12 Order at 24.) The court then

4   determined that plaintiffs had failed to plead Dura-Loc's

5   fraudulent conduct with sufficient facts under Rule 9 to support

6   its theory of liability. (Id. 26-27.) Consequently, the court found

7   that plaintiffs had failed to state a claim for successor liability

8   against Metals USA. (Id. 27.) In dismissing the complaint, the

9   court nevertheless granted plaintiffs leave "to conduct limited,

10  reasonable, tailored discovery into the course of dealings between

11  [Metals USA and Dura-Loc/604471 Ontario] in support of its

12  allegations of successor liability." (Id. 28.)

13      Metals USA claims that, in the course of this discovery, it

14  "responded to 18 interrogatories, 15 requests for admission and 37

15  requests for production of documents propounded by Plaintiffs, and

16  ultimately produced more than 4,700 pages of responsive documents.

17  Metals USA also submitted a corporate representative for deposition

18  taken by Plaintiffs' counsel." (Defendant's Motion to Dismiss

19  ("Motion") 13 n.3, ECF No. 50.)

20      Plaintiffs' Second Amended Complaint names Metals USA as the

21  sole defendant. Metals USA now moves to dismiss that complaint

22  under Rule 12(b)(6).

23  **II. STANDARD**

24      A dismissal motion under Rule 12(b)(6) challenges a

25  complaint's compliance with federal pleading requirements. Under

26  Rule 8(a)(2), a pleading must contain a "short and plain statement

1 of the claim showing that the pleader is entitled to relief." The

2 complaint must give the defendant "'fair notice of what the ...

3 claim is and the grounds upon which it rests.'" Bell Atlantic v.

4 Twombly, 550 U.S. 544, 555 (2007), quoting Conley v. Gibson, 355

5 U.S. 41, 47 (1957).

6     To meet this requirement, the complaint must be supported by

7 factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

8 Moreover, this court "must accept as true all of the factual

9 allegations contained in the complaint." Erickson v. Pardus, 551

10 U.S. 89, 94 (2007).[3]

11     "While legal conclusions can provide the framework of a

12 complaint," neither legal conclusions nor conclusory statements are

13 themselves sufficient, and such statements are not entitled to a

14 presumption of truth. Iqbal, 556 U.S. at 679. Iqbal and Twombly

15 therefore prescribe a two-step process for evaluation of motions

16 to dismiss. The court first identifies the non-conclusory factual

17 allegations, and then determines whether these allegations, taken

18 as true and construed in the light most favorable to the plaintiff,

19 "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S.

20 at 679.

21     "Plausibility," as it is used in Twombly and Iqbal, does not

22

23     [3] Citing Twombly, 550 U.S. at 555-56, Neitzke v. Williams, 490

24 U.S. 319, 327 (1989) ("[w]hat Rule 12(b)(6) does not countenance
are dismissals based on a judge's disbelief of a complaint's

25 factual allegations"), and Scheuer v. Rhodes, 416 U.S. 232, 236
(1974) ("it may appear on the face of the pleadings that a recovery

26 is very remote and unlikely but that is not the test" under
Rule 12(b)(6)).

1  refer to the likelihood that a pleader will succeed in proving the

2  allegations.  Instead, it refers to whether the non-conclusory

3  factual allegations, when assumed to be true, "allow[ ] the court

4  to draw the reasonable inference that the defendant is liable for

5  the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility

6  standard is not akin to a 'probability requirement,' but it asks

7  for more than a sheer possibility that a defendant has acted

8  unlawfully." Id. (quoting Twombly, 550 U.S. at 557).[4] A complaint

9  may fail to show a right to relief either by lacking a cognizable

10  legal theory or by lacking sufficient facts alleged under a

11  cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901

12  F.2d 696, 699 (9th Cir. 1990).

13  **III. ANALYSIS**

14       Metals USA argues that the SAC does not allege facts on which

15  to base a finding of successor liability against it, and therefore

16

17       [4] Twombly imposed an apparently-new "plausibility" gloss on
the previously well-known Rule 8(a) standard, and retired the

18  long-established "no set of facts" standard of Conley v. Gibson,
355 U.S. 41 (1957), although it did not overrule that case

19  outright. See Moss v. U.S. Secret Service, 572 F.3d 962, 968 (9th
Cir. 2009) (the Twombly Court "cautioned that it was not outright

20  overruling Conley ...," although it was retiring the "no set of
facts" language from Conley). The Ninth Circuit has acknowledged

21  the difficulty of applying the resulting standard, given the
"perplexing" mix of standards the Supreme Court has applied in

22  recent cases. See Starr v. Baca, 652 F.3d 1202, 1215 (9th
Cir. 2011) (comparing the Court's application of the "original,

23  more lenient version of Rule 8(a)" in Swierkiewicz v. Sorema N.A.,
534 U.S. 506 (2002) and Erickson v. Pardus, 551 U.S. 89 (2007) (per

24  curiam), with the seemingly "higher pleading standard" in Dura
Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), Twombly and

25  Iqbal), cert. denied, 132 S. Ct. 2101 (2012). See also Cook v.
Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011) (applying the "no set

26  of facts" standard to a Section 1983 case).

fails to state a claim upon which relief can be granted.

When the court sits in diversity, it must apply the substantive law of the forum in which it is located. <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938). California substantive law governs the issue of successor liability for the purposes of this motion.

Under California's rule of successor liability, a corporation purchasing the principal assets of another corporation does not assume the predecessor's liabilities unless one of the following exceptions applies:

(1) there is an express or implied agreement of assumption;

(2) the transaction amounts to a consolidation or merger of the two corporations;

(3) the purchasing corporation is a mere continuation of the seller;

(4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts; or

(5) the seller, had it remained a going concern, would have been liable under the doctrine of strict products liability.

<u>Ray v. Alad Corp.</u>, 19 Cal. 3d 22, 28, 34 (1977).[5]

_____

[5] While <u>Ray</u> is a products liability case, California courts apply the same rule in assessing successor liability in non-tort cases. <u>See</u>, <u>e.g.</u>, <u>McClellan v. Northridge Park Townhome Owners Ass'n, Inc.</u>, 89 Cal. App. 4th 746 (2001) (applying <u>Ray</u> to hold that, where plaintiff contractor had obtained judgment against homeowners association for amount due under contract, successor homeowners association was merely a continuation of predecessor, and could therefore be added as judgment debtor).

1    Plaintiffs argue for the imposition of successor liability
2  under the fourth Ray exception: that Dura-Loc conveyed assets to
3  Metals USA for the fraudulent purpose of avoiding liability for the
4  failing Tiles.[6]

5    The court granted Metals USA's previous motion, to dismiss the
6  First Amended Complaint, because plaintiffs had failed to plead
7  Dura-Loc's fraudulent conduct with sufficient particularity under
8  Rule 9(b). By contrast, the SAC pleads Dura-Loc's fraud in adequate
9  detail.

10    Metals USA nevertheless contends that the SAC fails to state
11 a cause of action for successor liability against it, as plaintiffs
12 have failed to allege that the firm "was knowingly a party to or
13 a participant in any alleged scheme or conspiracy to accomplish
14 this result [i.e., assisting Dura-Loc with fraudulently
15 transferring its assets in order to escape liability for warranty
16 claims]." (Motion 6-7.) The parties' arguments in support of, and
17 in opposition to, this position are set forth below.

18    **A. The parties' arguments regarding successor liability**

19       **1. Successor corporation also a victim of fraud**

20    According to Metals USA, plaintiffs' allegations
21 demonstrate that the firm was itself defrauded by Dura-Loc as to
22 (i) the number of potential and actual customer complaints and
23 warranty claims that Dura-Loc faced, and (ii) the willingness of

---

25    [6] The court assumes that plaintiffs have determined that they
26 can only proceed under a "fraudulent purpose" theory, and not one
   of the other Ray exceptions.

Dura-Loc (and its principals) to satisfy warranty claims. (Motion 7.) Consequently, Metals USA argues that "Plaintiffs' inability to allege Metals USA's fraudulent purpose in the Asset Purchase Agreement is fatal to their claims." (Motion 8.) Metals USA also contends that it justifiably relied on representations and warranties made by Dura-Loc in the Purchase Agreement. (Motion 10-11.) In support of this position, Metals USA cites Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1543 (2nd Cir. 1997) (holding that summary judgment was precluded by genuine fact question as to whether and when defendant had an obligation to conduct due diligence pursuant to oral agreement to purchase debt) for the proposition that protective warranty language in contracts must be accorded significance. (Motion 11.) Lazard Freres is not a successor liability case.

Plaintiffs counter that assigning successor liability based on the "fraudulent purpose" exception does not depend on a finding that the successor participated in the fraud. In support, plaintiffs cite Henkel Corp. v. Hartford Accident & Indemnity Co., 29 Cal. 4th 934 (2003) (concluding that successor corporation did not acquire benefits of insurance policies issued to predecessor corporation) and Cleveland v. Johnson, 209 Cal. App. 4th 1315 (2012) (holding that successor liability can apply to corporation that acquires the assets of an unincorporated, but clearly separate, line of business of another corporation). (Opposition 5-6, ECF No. 54.)

1    Metals USA, in turn, counters that <u>Henkel</u> is not a
2  successor liability case, and that <u>Cleveland</u> addresses the "mere
3  continuation," rather than the "fraudulent purpose," exception
4  to the rule against successor liability. According to Metals
5  USA, the statement in <u>Cleveland</u> that "[As Defendant]
6  transferred . . . assets to [the successor corporation] and hid
7  the formation of [the successor corporation] from [plaintiff]
8  for the purpose of avoiding liability under the contract with
9  [plaintiff, c]onsequently, successor liability would be
10 appropriate on this ground as well" is mere dicta. 209 Cal. App.
11 4th at 1334. (Reply 6, ECF No. 55.)

### 2. No liability for negligent due diligence

13   Metals USA next argues that to hold it liable based on
14 faulty due diligence in assessing the extent of the customer
15 complaints and warranty claims facing Dura-Loc would be to base
16 successor liability on a negligence standard, a theory that
17 Metals USA contends is without any foundation in California law.
18 (Motion 8, 11.) In support, Metals USA cites <u>Maloney v. Am.</u>
19 <u>Pharm. Co.</u>, 207 Cal. App. 3d 282 (1988) (holding that successor
20 corporation was not "mere continuation" of its predecessor such
21 that liability for the predecessor's negligent manufacturing
22 would attach) and <u>Monarch Bay II v. Prof'l. Serv. Indus., Inc.</u>,
23 75 Cal. App. 4th 1213 (1999) (holding that "product line"
24 exception to rule against successor liability applies only to
25 strict products liability claims, and does not encompass
26 negligence claims).

1    Plaintiffs do not appear to address this argument in their

2    opposition.

3              **3. Failure to establish inadequate purchase price**

4         Metals USA also argues that plaintiffs have failed to plead

5    Metals USA's fraudulent intent based on an inadequate purchase

6    price for Dura-Loc's assets. (Motion 12-14.) As noted in the

7    court's October 12, 2013 Order, the trial court in <u>Kim v.</u>

8    <u>Interfirst Capital Corp.</u>, No. G030719, 2003 WL 21214268,

9    2003 Cal. App. Unpub. LEXIS 5143 (Cal.Ct.App. May 27, 2003)

10   allowed the plaintiffs to proceed to a jury on this theory in a

11   successor liability case. Metals USA contends that plaintiffs

12   are simply using an incorrect measure of adequacy when they

13   compare the purchase price for Dura-Loc's assets to the firm's

14   revenue (approximately $11 million in 2005), rather than to its

15   earnings (approximately $1 million).

16        Plaintiffs argue at length that <u>Kim</u> does not apply to he

17   instant matter.[7] (Opposition 16-21.) Plaintiffs also claim that

18   "the adequacy of the consideration paid for a company's assets

19   is not measured based upon a company's earnings; rather, it is

20   whether the consideration is sufficient to pay the seller's

21   creditors," and go on to argue that Dura-Loc's warranty holders

22   are creditors. (Opposition 21.)

23        On reply, Metals USA reiterates that it was deceived as to

24   _____

25        [7] As Metals USA notes in its Reply, this is an ironic position
     for plaintiffs to take, given that <u>Kim</u> was the basis for the court
26   granting plaintiffs leave to amend and to proceed to discovery in
     its Oct. 12 Order. (Reply 7.)

1   the extent of warranty claims, that Dura-Loc was responsible for

2   these claims, and that plaintiffs' remedy lies with the Ontario

3   bankruptcy court. (Reply 9-10.) Metals USA also argues that the

4   price it paid for Dura-Loc's assets was sufficient to satisfy

5   warranty claims against Dura-Loc at the time of purchase, and

6   this is the relevant measure. (Motion 14.)

7       **B. Whether dismissal is warranted at this time**

8       Having considered the parties' arguments, the court is of

9   the view that it would be inappropriate to dismiss this matter

10  at this time. As the court previously noted, "Determinations of

11  successor liability are highly fact-specific, and it would be

12  inappropriate for the court to rule on the substantive merits of

13  plaintiffs' case for successor liability at the pleadings

14  stage." (Oct. 12 Order at 24.)

15      Successor liability is an equitable doctrine, and "the

16  question [of] whether it is fair to impose successor liability

17  is exclusively for the trial court." Rosales v. Thermex-

18  Thermatron, 67 Cal. App. 4th 187, 196 (1998). "Each successor

19  liability 'case must be determined on its own facts' including

20  looking at the 'totality of the unusual circumstances.'"

21  CenterPoint Energy, Inc. v. Superior Court, 157 Cal. App. 4th

22  1101, 1115 (quoting Rego v. ARC Water Treatment Co. of Pa., 181

23  F.3d 396, 403 (3d Cir. 1999)). There is simply not enough

24  evidence before the court to determine, at this stage of the

25  proceedings, whether or not it would be equitable to impose

26  successor liability on Metals USA. Even granting that the

1   procedural posture of this case is unusual — in that plaintiffs

2   had the opportunity to conduct targeted discovery before filing

3   the SAC — the record presented is insufficient for the court to

4   definitively rule that Metals USA cannot be held liable for

5   warranty claims on the Tiles.

6       The court granted Metals USA's prior motion to dismiss the

7   First Amended Complaint because the plaintiffs had failed to

8   sufficiently plead fraudulent conduct on Dura-Loc's part. The

9   SAC has cured that shortcoming.

10      Even if the court were to concede the correctness of Metals

11  USA's arguments herein — that it was defrauded by Dura-Loc as to

12  the number of warranty claims and the firm's unwillingness to

13  satisfy these claims, that its faulty due diligence in the run-

14  up to an asset sale cannot be the basis for successor liability,

15  and that plaintiffs have failed to satisfactorily allege an

16  inadequate purchase price for Dura-Loc's assets — additional

17  facts are pled in the SAC that are sufficient to state a claim

18  for successor liability against Metals USA.

19      Metals USA, both in its motion papers and at oral argument,

20  has taken the position that the court should only examine the

21  asset sale as a basis for finding successor liability. Metals

22  USA's core argument is as follows: if Dura-Loc, in selling its

23  assets, misled Metals USA as to the extent of accompanying

24  liabilities, then it would be inequitable to hold Metals USA

25  liable for warranty liabilities that it unwittingly assumed.

26      But it is unclear that the successor liability inquiry

1   should halt at the close of the asset sale, for the transactions

2   between the parties continued thereafter. Metals USA twice

3   initiated disputes against Dura-Loc, Reid, and Spriet for their

4   malfeasance in handling warranty claims, and received well over

5   one million dollars in settlement. Of the second settlement,

6   $345,055.75 (CDN) came in the form of a clawback of escrowed

7   funds, directly tying this transaction to the initial asset

8   sale. (SAC 37.) The Settlement Agreement purported to relieve

9   Metals USA of all responsibility for warranty claims, and the

10  First Amendment to the Settlement Agreement sought to relieve

11  Reid and Spriet of liabilities under the Purchase Agreement and

12  Settlement Agreement. (SAC 31, 37.) In other words, Dura-Loc was

13  left to handle all warranty claims, despite abundant evidence

14  that the firm was failing to honor warranty obligations. The SAC

15  also alleges that Metals USA employed Allen Reid to handle

16  warranty claims after the asset acquisition was completed, a

17  notable fact given that "[i]n nearly every case finding

18  successor liability due to a fraudulent transfer, the successor

19  entity is tied to the fraud in some way," typically through

20  sharing common shareholders or employees. (Oct. 12 Order at 21.)

21  In sum, an examination of the entire alleged course of post-sale

22  conduct between Metals USA, Dura-Loc, Reid, and Spriet "allows

23  the court to draw the reasonable inference that the defendant is

24  liable for the misconduct alleged," Iqbal, 556 U.S. at 678,

25  specifically, that Metals USA may have colluded with the other

26  parties to leave injured Tile purchasers without a realistic

1    means of redress. Dismissal therefore appears unwarranted at

2    this stage.

3        The foregoing should *not* be taken to mean that the court

4    has determined that Metals USA can be held liable under a

5    successor liability theory; merely that, as a matter of

6    pleading, the SAC articulates a claim for successor liability

7    against Metals USA, and therefore, it would be premature to

8    grant the instant motion to dismiss. "[A]ccept[ing] as true all

9    of the factual allegations contained in the complaint,"

10   Erickson, 551 U.S. at 94, the court finds that the SAC states a

11   plausible claim for successor liability against Metals USA.

12   Accordingly, plaintiffs may proceed with their case.

13   **IV. CONCLUSION**

14       The court orders as follows:

15           [1] Defendant Metals USA, Inc.'s motion to dismiss

16           plaintiffs' First Amended Complaint for failure to

17           state a claim is DENIED.

18           [2] The clerk of the court is DIRECTED to note that,

19           as 604471 Ontario, Inc. has been dismissed as a

20           defendant, this case should henceforth be entitled

21           Wilson, et al. v. Metals USA, Inc. in the court's

22           CM/ECF system.

23       IT IS SO ORDERED.

24       DATED:  August 27, 2013.

25                                LAWRENCE K. KARLTON
                                  SENIOR JUDGE
26                                UNITED STATES DISTRICT COURT