1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAMES WILSON, an individual, and              No.  2:12-CV-00568-KJM-CKD (TEMP)
      JACK WHITE, an individual, on behalf of
12    themselves and all others similarly situated,

13                         Plaintiffs,             ORDER

14           v.

15    METALS USA, INC., a Delaware
      Corporation, and DOES 1–100, inclusive,
16
                         Defendant.
17

18

19           James Wilson and Jack White purchased roof tiles manufactured by Dura-Loc

20    Roofing Systems Limited.  They allege those tiles were defectively designed because over time,

21    as the tiles were exposed to air and sunlight, they lost their color.  Because Dura-Loc gave them a

22    written warranty promising the tiles were "UV resistant," Wilson and White allege violations of

23    California Commercial Code section 2313.  They bring this action against Metals USA, Inc., the

24    alleged successor to Dura-Loc's liability.

25           Wilson and White propose to represent a class of property owners who purchased

26    similarly defective tiles.  They move for class certification, and Metals USA opposes the motion.

27    The court held a hearing on December 4, 2015.  Gene Stonebarger and Richard Lambert appeared

28
                                              1

1   for the plaintiffs, and Frank Busch, Bart Dalton, and Adrian Sawyer appeared for the defendant.

2   For the reasons described below, the motion is granted.

3   I.      FACTUAL BACKGROUND

4              A few details about Dura-Loc and its roofing tiles help set the stage.  Dura-Loc

5   began in Ontario, Canada in 1984.  Reid Decl. ¶ 15, ECF No. 81-3.  Between 1985 and 2006, it

6   manufactured part-metal, part-stone, layered roofing tiles.  *Id.*; *see also* Stonebarger Decl. Ex. D,

7   at MUSA 003923, ECF No. 81-3.  The base or substrate layer is pressure-formed by galvanized

8   steel.  Stonebarger Decl. Ex. D, at MUSA 003923.  The tiles' top sides, which were the sides

9   eventually exposed to the elements, were coated with crushed stone chips, granules of

10  "Colorquartz Aggregate" manufactured by 3M.  *See* Dalton Decl. Exs. B, D, ECF No. 82-2.

11  Overall, each tile is a little more than four feet wide and about fifteen inches deep.  *See*

12  Stonebarger Decl. Ex. D, at MUSA 003923.  When installed on a roof, each tile overlaps with

13  adjacent tiles to protect the structure below.  *Id.*

14             This case concerns three specific types of tiles, the "Continental," "Shadowline,"

15  and "Wood Shake" product lines.  All three have the same structure and composition.  *See, e.g.*,

16  Stonebarger Decl. Exs C, E, G, H, S, T, X, ECF Nos. 81-3, 81-4; *see also* Harlan Rep. 3, ECF

17  No. 81-29.  The tiles were also manufactured using the same process:  After a protective coating

18  was applied to the tiles' backsides, a layer of acrylic basecoat was applied at a thickness of

19  between 14 and 18 thousandths of an inch.  *See* Dalton Decl. Ex. F, at 7.  A layer of colored

20  granules was then dropped onto the basecoat, and the tiles were baked in an oven until dried.  *Id.*

21  at 7–8.  Finally, a topcoat layer was applied, and the tiles were baked again until dry.  *Id.* at 8.

22             The tiles in each product line were available with several different colors of stone

23  granules: "Continental" in four colors; "Shadowline" in two colors, and "Shake" or "Wood

24  Shake" in four colors.  *See* Dalton Decl. Ex. E, at 8, ECF No. 82-2; *id.* Ex. F, at 8.  The granules

25  do not block ultraviolet light completely.  Their transparency to ultraviolet light varies by color;

26  /////

27  /////

28  /////

2

1    between 22 percent and 93 percent of the ultraviolet light that strikes the granules passes through

2    them.  Third Am. Compl. Ex. I, at PLS0000025, ECF No. 78-9.[1]

3              Metals USA entered the picture in 2006, when it purchased Dura-Loc's operating

4    assets, including its manufacturing facility in Ontario, Canada.  *See* Reid Decl. ¶¶ 14–15.

5    According to the purchase agreement, Dura-Loc and two of its principal shareholders agreed to

6    indemnify Metals USA for any damages incurred as a result of Dura-Loc's warranty obligations,

7    among many other provisions not relevant to this motion.  *See* Stonebarger Decl. Ex. AA, ¶ 6.1,

8    ECF No. 81-5.  After the purchase, Metals USA changed the stone and basecoat Dura-Loc had

9    been applying to the Dura-Loc tiles to match those used by a Metals USA affiliate.  Obj. & Resp.

10   Interrog. 5, ECF No. 81-6.  Dura-Loc then ended operations and changed its name to "604471

11   Ontario, Inc."  *Id.* ¶ 14.  Later, in 2012, it filed for bankruptcy.  *Id.*

12             Plaintiff James Wilson bought Dura-Loc's "Wood Shake"-style metal roofing tiles

13   in 2004, before Metals USA purchased Dura-Loc's assets, to install on his home in Roseville,

14   California.  Wilson Decl. ¶ 2, ECF No. 81-10.  Wilson chose Dura-Loc's tiles because they came

15   with a written warranty guaranteeing, as he understood it, that the tiles were resistant to

16   ultraviolet light and would not deteriorate for at least twenty-five years after installation.  *Id.*  In

17   about June 2011, however, Wilson noticed the tiles installed on his roof had begun to deteriorate:

18   they had lost some of their stone coating and granular texture.  *Id.* ¶ 4.  He contacted a division of

19   Metals USA, whose customer service department responded with a letter explaining Metals USA

20   did not manufacture or sell Dura-Loc tiles and that any warranty claims were the responsibility of

21   604471 Ontario.  *Id.*; *see also id.* Ex. C, ECF No. 81-13.  Wilson contacted 604471 Ontario, who

22   required the refundable $400 "service fee" before it would begin investigating his claim.  *See id.*

23   ¶ 4; *see also id.* Ex. D, ECF No. 81-14.  It does not appear Wilson paid the $400 fee.  *See* Wilson

24   Dep. 42–44, ECF No. 82-2.  His Dura-Loc tiles continue to deteriorate, and have now lost most of

25   their original color and texture.  *Id.* ¶ 5.

26

27   _____

     [1] This document is a "3M Technical Bulletin" dated January 1995, and the accuracy of its

28   contents appears undisputed at this stage.  *See* Opp'n Class Cert. 3 & n.2, ECF No. 82.

A copy of Wilson's warranty is on file.  *See* Wilson Decl. Ex. A, ECF No. 81-11. Its specific terms are relevant and worth reviewing in some detail:

- The warranty applies to all three product lines, "Continental," "Shadowline," and "Wood Shake," both panels and trim.

- Dura-Loc guaranteed that "for a period of 25 years following proper installation, the surface coating of the Dura-Loc product shall be UV resistant* and will not deteriorate as a result of a manufacturing defect to the extent that the appearance of the roof is substantially affected."  The asterisk after the words "UV resistant" refers to a note that "[a]t the date of installation, the coating will meet or exceed industry standards when tested to ASTM 4214-89 standards given the service life of the roof."

- If the purchaser files a claim, "taking all circumstances into account, Dura-Loc will, at is sole option, either repair or replace the affected Product or apply its then current colour coordinated acrylic thereto."

- Dura-Loc's total liability is limited to the actual purchase price paid by the original purchaser for the first fifteen years after installation and "thereafter a declining balance of such amount reduced on a pro rata basis of the remaining 10 year period."

- The warranty covers only purchasers who register their purchase by mail within ninety days of installation.  If the warranty is not properly registered, it lasts only two years.

- If the tiles are installed and the property is sold, the warranty applies to the subsequent purchaser only if he or she gives written notice of the sale within ninety days and pays a registration fee of $25.

- The purchaser must give written notice of any claim under the warranty within thirty days of discovering a defect.

- To make a claim, the purchaser must send a copy of the limited warranty, proof of the date of purchase and installation, and a refundable service fee of $400, "the

4

1    estimated cost of investigating each complaint."   "Failure to comply with [this]

2    notification requirement will invalidate the Limited Warranty."

3    •    "Any objection, complaint, suit, legal proceeding or action" arising from the

4    warranty must be brought within one year of the date Dura-Loc takes corrective

5    measures or communicates its denial of a claim, and "claimant hereby waives all

6    statutory and common law periods of limitation in excess of [the one-year

7    period]."

8    Jack White, the second plaintiff named in the caption, tells a story similar to

9    Wilson's.  White bought Dura-Loc's "Wood Shake" tiles in June 2004 and installed them on his

10   home in Orangevale, California.  White Decl. ¶ 2, ECF No. 81-16.  He also relied on Dura-Loc's

11   guaranty that its tiles were resistant to ultraviolet radiation and would not deteriorate for at least

12   twenty-five years.  *Id.*  Like Wilson, he noticed in June 2011 that his tiles had begun to

13   deteriorate.  *Id.* ¶ 4.  And like Wilson's tiles, White's tiles have lost most of their original color

14   and texture.  *Id.* ¶ 5.  Unlike Wilson, however, White does not explain whether he filed a

15   warranty claim or contacted Metals USA or 604471 Ontario.  *See generally id.*  It appears he did

16   not.  *See* White Dep. 16–17, ECF No. 82-2.  The record does not include a copy of his warranty.

17   Wilson and White have filed declarations from about sixty others who purchased

18   Dura-Loc roofing tiles.  *See* Class Member Declarations, ECF Nos. 81-17 to -28.  These

19   customers' tiles also degraded within a few years of installation.  *See generally id.*  Many of these

20   customers' declarations are accompanied by copies of warranty agreements whose terms are

21   similar or identical to those of Wilson's warranty, with two exceptions.  First, it appears Dura-

22   Loc did not include the $400 service fee in its warranties until in or about 2003 or 2004.

23   *Compare, e.g.*, Class Member Decl. No. 36 (Heep), Ex. A, ECF No. 81-24 (no service fee; dated

24   April 1, 2003), *with, e.g.*, Wilson Decl. Ex. A (service fee; dated Sept. 1, 2004).  Second,

25   warranties issued before in or about 2003 or 2004 appear not to impose a registration requirement

26   on original purchasers, and likewise allow no alternative two-year warranty period.  *Compare,*

27   *e.g.*, Heep Decl. Ex. A, *with, e.g.*, Wilson Decl. Ex. A.  Aside from these differences, the parties

28   agree the warranties' terms remained the same between 1996 and 2006.

1        To investigate what caused the tiles' degradation, White and Wilson engaged

2   Harold Harlan, a chemist.  Harlan analyzed the exterior coating of several unused Dura-Loc tiles

3   manufactured between 1999 and 2006.  *See* Harlan Rep. at 1.  He also tested three used tiles that

4   had been installed on Jack White's roof; two tiles from the north side and one from the south side.

5   *See id.*  He subjected these tiles to Fourier transform infrared spectroscopy (FTIR), a test used to

6   determine the chemical composition of a given material based on the spectrum of infrared light it

7   absorbs.  *See id.* at 2.  Harlan concluded the exterior coating of all the tiles he tested was "similar,

8   if not identical," and consisted of a mixture of three acrylic polymers and quartz silica sand.  *Id.*

9   at 3.  As for the three used tiles, he reported that the south-side tile and one of the north-side tiles

10  emitted light in a spectrum that indicated their acrylic polymers had broken down after exposure

11  to ultraviolet light and air.  *Id.* at 3–4.  One of the north-side tiles did not.  *Id.* at 4.  In addition,

12  only the south-side tile displayed visual degradation.  *See id.* at 3–4.  Mr. Harlan expected, given

13  the similar composition of all the tiles he tested, that if all had been exposed to the same light and

14  air as the south-side sample tile had been, all would have exhibited the same visual and chemical

15  degradation.  *Id.* at 4.

16        Given Harlan's test results and their own observations, Wilson and White allege

17  that when Dura-Loc's tiles are exposed to a few years of sunlight and air, the layer of resin

18  between the tiles' steel base and the colored stone granules is compromised, and the granules fall

19  off.  They argue that because the tiles at issue were all manufactured by the same process and to

20  the same specifications, the defect is in the tiles' design and is common to every tile.

21        Metals USA disagrees.  It engaged another chemist, Richard Cechner, to analyze

22  roof tiles from Wilson's and White's homes.  *See* Cechner Rep. 1, ECF No. 82-3.  Cechner

23  reviewed Dura-Loc's technical and quality control manuals, visited Wilson's and White's homes,

24  and examined samples of their roof tiles, both used and unused.  *See generally id.*  He estimated

25  that when dried, the layer of acrylic between the tiles' metal base and the colored granules should

26  have been about 6 to 9 thousandths of an inch thick, if it had been applied as specified in Dura-

27  Loc's quality control manual.  *See id.* at 2.  He then examined cross-sections of the sample tiles

28  from Wilson's and White's roofs, and found that in many instances the dried layer of acrylic was

6

1    less than 6 thousandths of an inch thick.  *Id.* at 3–4.  In other instances, he found no evidence to

2    show a topcoat layer was ever applied, and sometimes granules were not seated well in the dried

3    basecoat.  *Id.*  Based on this investigation, he concluded that the longevity of the bond between

4    the metal base and the colored granules depended on both how thickly and evenly the acrylic

5    basecoat was applied and whether a topcoat was applied.  *Id.* at 4.  He also concluded the sample

6    tiles he tested did not comply with the specifications in Dura-Loc's quality control manuals.  *Id.*

7    It is therefore Metals USA's theory that the plaintiffs' tiles did not suffer from a design defect,

8    but a manufacturing defect.  *See* Opp'n 14–15, 27–28.

9    II.      PROCEDURAL HISTORY

10              That brings us to this case.  Wilson and White filed a complaint in this court in

11   March 2012 against 604471 Ontario, Inc. and Allan Reid, allegedly a former Dura-Loc executive.

12   Compl., ECF No. 1.  Essentially, they allege that contrary to Dura-Loc's warranty, the roofing

13   tiles were not "UV resistant" and degraded over time by shedding their layer of stone granules.

14   In their first complaint, they alleged three claims: fraudulent concealment or non-disclosure, Cal.

15   Civ. Code §§ 1709, 1710(3); violations of the California Consumer Legal Remedies Act (CLRA),

16   Cal. Civ. Code §§ 1750 *et seq.*; and violations of the California Unfair Competition Law (UCL),

17   Cal. Bus. & Prof. Code §§ 17200 *et seq. Id.*  They later amended the complaint to substitute

18   Metals USA as a defendant in place of 604471 Ontario and to add claims for breaches of express

19   warranties under California Commercial Code section 2313 and 15 U.S.C. § 2301.  *See* First Am.

20   Compl., ECF No. 11.

21              Reid moved to dismiss the claim against him for lack of personal jurisdiction, ECF

22   No. 22, and the court dismissed the complaint with leave to amend, ECF No. 34.  Plaintiffs filed a

23   second amended complaint, omitting Reid as a defendant and advancing only claims for breach of

24   written warranties and violations of the CLRA and UCL.  *See* Second Am. Compl., ECF No. 49.

25   Metals USA moved to dismiss, arguing the complaint lacked sufficient factual allegations to

26   make out a plausible claim for its liability under a theory of successor liability.  ECF No. 50.  The

27   court denied the motion, ECF No. 57, and Metals USA answered, ECF No. 59.

28   /////

7

1   Plaintiffs filed a third amended complaint by stipulation, ECF Nos. 76, 77, and

2   that pleading remains operative, *see* Third Am. Compl., ECF No. 78.  The case now proceeds on

3   two claims for breach of express warranty, California Civil Code sections 1790 *et seq.* and

4   Commercial Code section 2313, and on the previously asserted claims for violations of the CLRA

5   and UCL.  Metals USA is the only remaining defendant.

6   On September 4, 2015, plaintiffs moved for class certification of only one claim:

7   breach of express warranty under Commercial Code section 2313.  *See* Mot. Class Cert., ECF

8   No. 81; Mem. P. & A. at 14, ECF No. 81-1; Reply 1 & n.1, ECF No. 83.  Metals USA opposed

9   the motion, Opp'n, ECF No. 82, and the plaintiffs replied, Reply, ECF No. 83.  Wilson and White

10   propose the following class definition:

> All individuals and entities that own homes or other structures
> located in the State of California on which Dura-Loc Roofing
> Systems Limited's Continental, Shadow line, or Wood Shake stone
> coated steel roof shingles were installed during the period of time
> beginning July 1, 1996 through May 12, 2006.

14   Mem. at 10.

15   Following the court's hearing on December 4, 2015, plaintiffs submitted an

16   unsolicited supplemental brief addressing a California Civil Code section discussed at hearing,

17   California Civil Code § 1797.94, and whether it applies to this case.  ECF No. 86.  In general,

18   section 1797.94 concerns whether home roof warranties are enforceable by one who is not the

19   original purchaser.  Metals USA filed a supplemental brief opposing the plaintiffs' interpretation

20   of that section.  ECF No. 87.  Because no objections to these briefs were filed, and each party has

21   had an opportunity to express its views, the court considers their merits here.

22   III.   LEGAL STANDARD

23   Litigation by class action is "an exception to the usual rule" that only the

24   individual named parties bring and conduct lawsuits.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

25   338, 348 (2011) (citation and internal quotation marks omitted).  Only when a class action would

26   promote the "efficiency and economy of litigation" should a motion for certification be granted.

27   *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983).  Class certification is governed by

28   Federal Rule of Civil Procedure 23.  To be certified, a putative class must meet the threshold

1   requirements of Rule 23(a) and the more specific requirements of one of three classes defined in

2   Rule 23(b).  *Leyva v. Medline Industries Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

3          Rule 23(a) imposes four requirements on every class.  First, the class must be "so

4   numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Second,

5   questions of law or fact must be common to the class.  *Id.* R. 23(a)(2).  Third, the named

6   representatives' claims or defenses must be typical of those of the class.  *Id.* R. 23(a)(3). And

7   fourth, the representatives must "fairly and adequately protect the interests of the class." *Id.* R.

8   23(a)(4).

9          Here, the plaintiffs seek certification under Rule 23(b)(3), which imposes two

10  additional requirements: first, "that the questions of law or fact common to class members

11  predominate over any questions affecting only individual members," and second, "that a class

12  action is superior to other available methods for fairly and efficiently adjudicating the

13  controversy."  The test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a).  *Wolin*

14  *v. Jaguar Land Rover N. Am.*, *LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*

15  *Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)).

16         "The party seeking class certification bears the burden of demonstrating that the

17  requirements of Rules 23(a) and (b) are met."  *United Steel, etc. v. ConocoPhillips Co.*, 593 F.3d

18  802, 807 (9th Cir.2010).  This burden is real; Rule 23 embodies more than a "mere pleading

19  standard."  *Wal-Mart*, 564 U.S. at 350.  The moving party must "prove that there are *in fact*

20  sufficiently numerous parties, common questions of law or fact, etc."  *Id.* (emphasis in original).

21  The trial court must then conduct a "rigorous analysis" of whether the party has met its burden,

22  *id.*, and "analyze each of the plaintiff's claims separately," *Berger v. Home Depot USA, Inc.*, 741

23  F.3d 1061, 1068 (9th Cir. 2014) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S.

24  804, 809 (2011)).  The court must verify the putative class's "actual, not presumed, conformance

25  with Rule 23(a) . . . ."  *Wal-Mart*, 564 U.S. at 351 (alterations omitted) (quoting *Gen. Tel. Co. of*

26  *Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).  This inquiry often overlaps with consideration of the

27  merits of the plaintiffs' substantive claims.  *Id.* at 351–52.  Indeed, "a district court *must* consider

28  the merits if they overlap with the Rule 23(a) requirements."  *Ellis v. Costco Wholesale Corp.*,

1    657 F.3d 970, 981 (9th Cir. 2011) (emphasis in original); *see also Comcast Corp. v. Behrend*, ___

2    U.S. ___, 133 S. Ct. 1426, 1433 (2013) ("[O]ur cases requir[e] a determination that Rule 23 is

3    satisfied, even when that requires inquiry into the merits of the claim.").

4    IV.    DISCUSSION

5          A.    Numerosity

6               To be certified, a class must be "so numerous that joinder of all members is

7    impracticable." Fed. R. Civ. P. 23(a)(1).  Here, the parties do not contest the sufficient

8    numerosity of the proposed class, which plaintiffs estimate will include about one thousand

9    members.  It is sufficiently numerous.  *See, e.g.*, *Rannis v. Recchia*, 380 F. App'x. 646, 651 (9th

10   Cir. 2010) (courts generally find the numerosity requirement satisfied when a class includes at

11   least forty members); *see also Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal.

12   2010) (collecting authority and finding a class of approximately 1,000 sufficiently numerous).

13         B.    Adequacy

14              Rule 23(a) refers to the adequacy of both class representatives and class counsel.

15   *See Falcon*, 457 U.S. at 157 n. 13; *Ellis*, 657 F.3d at 985.  "Adequate representation depends on,

16   among other factors, an absence of antagonism between representatives and absentees, and a

17   sharing of interest between representatives and absentees." *Ellis*, 677 F.3d at 985.  The adequacy

18   requirement is of constitutional provenance, as "it would violate the Due Process Clause of the

19   Fourteenth Amendment to bind litigants to a judgment rendered in an earlier litigation to which

20   they were not parties and in which they were not adequately represented." *Richards v. Jefferson

21   Cty., Ala.*, 517 U.S. 793, 794 (1996).

22              Here, Metals USA does not dispute the adequacy of plaintiffs' counsel, Opp'n 12

23   n.11, but argues Wilson and White are not adequate representatives.  It points out two potential

24   conflicts of interests.  First, it suggests the proposed class definition allows both current and

25   former owners of the same roof to seek redress for the same injury.  This argument may be

26   rejected out of hand.  The proposed class definition includes only current owners of structures on

27   which the allegedly defective roof tiles were installed.

28   /////

1          Second, Metals USA points out that both named plaintiffs are owners of roof tiles

2    that have already degraded, and may have little incentive to protect the interests of those whose

3    tiles have not yet degraded.  A conflict of interest between class members is one object of the

4    Rule 23(a) adequacy inquiry, *Amchem*, 521 U.S. at 625, but the conflict identified by Metals USA

5    does not prevent certification here.

6          In general, class members and class representatives must possess the same

7    interests and must have suffered the same injury.  *Id.*  *Amchem* is one classic case of intra-class

8    conflict.  In that case, the parties proposed a settlement class.  *Id.*  A conflict arose over the

9    allocation of settlement funds.  *Id.*  The Supreme Court found the class could not be certified,

10   among other reasons because the putative class faced internal conflicts of interest: some class

11   members sought recompense for injuries they had already sustained, and their "critical goal [was]

12   generous immediate payments," whereas those whose injuries had not yet materialized had a

13   conflicting interest "in ensuring an ample, inflation-protected fund for the future."  *Id.* at 626.  In

14   short, some plaintiffs had an interest in maximizing and distributing current funds, whereas others

15   had an interest in preserving resources.

16         The putative class here faces no such internal rifts.  Two analogous cases show

17   why.  First, in *Hanlon v. Chrysler Corporation*, the Ninth Circuit found the class faced no fatal

18   conflict of interest.  Each potential plaintiff had the same potential problem with his or her

19   minivan: an allegedly defective latch, which would require repair or compensation.  150 F.3d

20   at 1021.  The severity of each person's injury was similar, the class representatives included

21   representatives from each state to avoid conflicts arising from state law, and no inherently

22   variable personal injury or wrongful death claims were included in the class claims.  *Id.*  Each

23   class member was treated similarly, even identically.  *Id.*

24         Second, in *Dewey v. Volkswagen AG*, the plaintiff class alleged their cars had

25   leaky sunroofs.  681 F.3d 170, 174 (3d Cir. 2012).  The district court approved a settlement plan

26   to distribute up to $8 million to one group of class members to reimburse them for damages

27   sustained.  Any leftover funds would be distributed to a residual group whose members could

28   make "goodwill" claims.  The Third Circuit found this division created no adequacy problem.

1    Unlike in *Amchem*, the circuit court reasoned, "[a] class member who has already suffered

2    leakage, and is thus a 'past' claimant, can continue to suffer leakage into the future to the same

3    extent as a future claimant, and can continue to make future claims.  As such, past claimants also

4    have an incentive to protect the ability of class members to make claims for future damage."  *Id.*

5    at 185–86 (footnote omitted).

6         Here, as in *Hanlon* and *Dewey*, and unlike in *Amchem*, each class member has the

7    same problem: the roof tiles they bought suffer from a defect that may cause them to shed their

8    top layer and lose their color.  No personal injury, wrongful death, state law, or other structural

9    divisions will poison one subgroup against another.  This is true regardless of whether the

10   putative class members' roof tiles have already degraded or may later degrade.  Moreover, the

11   putative class here is not a settlement class.  The problems associated with settlement classes—

12   most importantly a settlement fund limited to a specific, predetermined value—do not set up the

13   putative class members here against one another as was the case in *Amchem*.

14        The named plaintiffs and their counsel are adequate representatives.

15        C.    <u>Typicality</u>

16        Rule 23(a) requires the plaintiffs to demonstrate the representatives' claims and

17   defenses are typical of the class.  Typicality turns on the nature of the claims or defenses asserted,

18   not the facts from which they arise.  *Ellis*, 657 F.3d at 984.  "The purpose of the typicality

19   requirement is to assure that the interest of the named representative aligns with the interests of

20   the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Accordingly, the

21   representative must be a part of the class and "possess the same interest and suffer the same

22   injury" as the other putative class members.  *Falcon*, 457 U.S. at 156 (citation and internal

23   quotation marks omitted).  But these interests and injuries "need not be substantially identical."

24   *Hanlon*, 150 F.3d at 1020.

25        More specifically, a representative plaintiff may be atypical of the class if he or

26   she would be subject to unique defenses the other class members would not face.  A motion for

27   class certification should therefore be denied if the named plaintiff "is preoccupied with defenses

28   unique to it."  *Ellis*, 657 F.3d at 984 (quoting *Hanon*, 976 F.2d at 508).  In *Hanon*, for example,

1    the Ninth Circuit found the named plaintiff faced unique defenses "as a result of his extensive

2    experience in prior securities litigation, his relationship with his lawyers, his practice of buying a

3    minimal number shares of stock in various companies, and his uneconomical purchase of only ten

4    shares of stock." 976 F.2d at 508. He was therefore an inappropriate class representative. *Id.*

5    at 509. But a defense is not unique, no matter how forceful, if it is "typical of claims [the

6    defendant] will raise against the class as a whole." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D.

7    492, 534 (N.D. Cal. 2012).

8            Metals USA argues Wilson's and White's claims are atypical of the class's claims

9    for three reasons. First, it points out that both Wilson and White purchased Wood Shake shingles,

10   but seek to represent a class of customers who purchased Continental and Shadow line tiles. It is

11   correct that differences in product designs or make-up may preclude certification of class claims

12   for design defects. *See, e.g.*, *Johnson v. Harley-Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573,

13   579 (E.D. Cal. 2012) ("[T]he class vehicles do not have a uniform design across the different

14   models. . . . [T]here are more than 130 configurations and numerous factors affecting heat in the

15   class vehicles."). Likewise, if a representative did not purchase the allegedly defective product,

16   he or she may not represent class members who did. *Gonzalez v. Procter & Gamble Co.*, 247

17   F.R.D. 616, 621 (S.D. Cal. 2007) (class representative's claims not typical because "the evidence

18   in the record shows that the product Plaintiff purchased was not the subject of specific hair

19   strengthening claims during the proposed class period"). Here, however, the record lacks any

20   indication that Wilson's and White's tiles were designed differently than the other putative class

21   members' tiles. Rather, as described above, the record suggests the tiles were designed and

22   manufactured very similarly, if not identically.

23           Second, Metals USA argues each type of tile came in different colors, and the

24   tiles' UV resistance varies by color. This varying UV resistance leads to variation in the

25   degradation of each tile over time, such that two tiles on the same roof, installed at the same time,

26   facing the same direction may degrade at different rates. In cases of allegedly defective products,

27   a class may be certified even if the plaintiff does not prove the alleged defect manifested itself in

28   every product the class owns, let alone that a problem manifested itself in different ways. *Baker*

1   *v. Microsoft Corp.*, 797 F.3d 607, 610 (9th Cir. 2015), *cert. granted in part on other grounds*,

2   136 S. Ct. 890 (2016);[2] *see also Wolin*, 617 F.3d at 1175 ("Typicality can be satisfied despite

3   different factual circumstances surrounding the manifestation of the defect.").  The timing of the

4   defect's manifestation is a question of damages, not class certification.  *Baker*, 797 F.3d at 611

5   (citing *Wolin*, 617 F.3d at 1175).  Thus the class may be certified despite the tiles' varying rates

6   of degradation.  Here, the alleged defect is the same, no matter how quickly it manifested: the

7   tiles are not UV resistant.  The court acknowledges Metals USA's argument that the defect is not

8   a design defect, but a manufacturing defect, and that therefore no single homeowner can have

9   claims typical of another; however, this is a question of the merits, one the court need not reach at

10  the class-certification stage.

11          Third, although Metals USA does not raise the argument directly, it notes that

12  Wilson and White appear to have conceded in their depositions that they did not comply with

13  their warranties' notice conditions.  *See* Opp'n at 6 (citing Wilson Dep. 42–44 and White Dep.

14  16–17).  Although compliance with the warranty's terms may present an obstacle for Wilson and

15  White, non-compliance is a defense Metals USA intends to assert against the class as a whole, *see*

16  Opp'n at 18–19, and does not preclude certification.

17          The claims and defenses are typical of the class.

18      D.      Commonality and Predominance

19          The court first reviews the requirements of commonality and predominance in

20  general, and second considers the application of these principles to this case.

21          1.      In General

22          Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ.

23  P. 23(a)(2).  Common questions exist when class members suffer the same injury, *Falcon*, 457

24  U.S. at 156, such that simultaneous litigation is productive, *Wal-Mart*, 564 U.S. at 349–50.  "This

25  does not mean merely that [class members] have all suffered a violation of the same provision of

26  ───────────────

27          [2] The Supreme Court granted the petition for a writ of certiorari "limited to the following
question: Whether a federal court of appeals has jurisdiction under both Article III and 28 U.S.C.
§ 1291 to review an order denying class certification after the named plaintiffs voluntarily dismiss

28  their individual claims with prejudice."  *Id.*

law." *Id.* at 350.  Rather, the claims "must depend upon a common contention," the nature of which "is capable of classwide resolution."  *Id.*  Common litigation must "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  Although just one common question could suffice to establish commonality, *id.* at 2556, the true inquiry is into "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation," *id.* at 359 (emphasis in original) (citation and internal quotation marks omitted). "Dissimilarities within the proposed class . . . have the potential to impede the generation of common answers." *Id.* (citation and internal quotation marks omitted).

After establishing the existence of common questions of law or fact, the proponent of a putative class must also establish that these questions "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The party seeking certification must show "(1) that the existence of individual injury resulting from the alleged . . . violation . . . [is] capable of proof at trial through evidence that is common to the class rather than individual to its members; and (2) that the damages resulting from that injury [are] measurable on a class-wide basis through use of a common methodology."  *Comcast*, 133 S.Ct. at 1430 (citation and internal quotation marks omitted).  "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1022).  Courts are required "to take a 'close look' at whether common questions predominate over individual ones," *Comcast*, 133 S. Ct. at 1432 (quoting *Wal-Mart*, 564 U.S. at 615), "begin[ning] . . . with the elements of the underlying cause of action," *Erica P. John Fund, Inc.*, 563 U.S. at 809.  Rule 23(b)(3) is therefore "more demanding than Rule 23(a)."  *Comcast*, 133 S. Ct. at 1432.

Nevertheless, some variation is permitted among individual plaintiffs' claims, *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th Cir. 2013), and the proponent of a class need not "prove that each element of her claim is susceptible to classwide proof," *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, ___ U.S. ___, 133 S. Ct. 1184, 1196 (2013) (citations, internal quotation marks, and alterations omitted).  Similarly, because "'individualized monetary

15

1    claims belong in Rule 23(b)(3),'" "the presence of individual damages cannot, by itself, defeat

2    class certification . . . ." *Leyva*, 716 F.3d at 514 (quoting *Wal-Mart*, 564 U.S. at 362).  Neither

3    must a plaintiff show at the certification threshold that predominant questions will be answered in

4    her favor.  *Amgen*, 133 S. Ct. at 1196.  The court considers the merits only to the extent required

5    by Rule 23.  *Id.* at 1194–95 (citing *Wal-Mart*, 564 U.S. at 351 n. 6).

6             As noted above, the commonality and predominance inquiries begin with the

7    elements of the plaintiffs' claims.  *Erica P. John Fund, Inc.*, 563 U.S. at 809.  The court therefore

8    briefly reviews the elements of the plaintiffs' claim under California Commercial Code

9    section 2313.  That section provides, "Any affirmation of fact or promise made by the seller to the

10   buyer which relates to the goods and becomes part of the basis of the bargain creates an express

11   warranty that the goods shall conform to the affirmation or promise."  Cal. Com. Code

12   § 2313(1)(a).  From this language California courts have distilled three elements "(1) the seller's

13   statements constitute an 'affirmation of fact or promise' . . . ; (2) the statement was 'part of the

14   basis of the bargain'; and (3) the warranty was breached."  *Weinstat v. Dentsply Int'l, Inc.*,

15   180 Cal. App. 4th 1213, 1227 (2010).  Some cases mention a fourth element: the breach caused

16   injury to the plaintiff.  *See, e.g.*, *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306,

17   1333 (C.D. Cal. 2013); *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142 (1986).

18                        2.        The Plaintiffs' Claims Here

19            The general discussion above raises two questions: first, which if any of the

20   questions presented in this case are common, and second, whether these common issues

21   predominate.  To address these questions, the court first considers whether several aspects of this

22   case present common or individualized questions of law or fact.  The first four of these aspects

23   are tied to the four elements of the plaintiffs' claims.  The fifth concerns one of Metals USA's

24   affirmative defenses, the statute of limitations.  The sixth and seventh are factual matters

25   particular to this case: whether the tiles' degradation is attributable to a manufacturing or design

26   defect and whether Metals USA is liable as a successor to Dura-Loc.  As discussed below, several

27   of these issues present common questions of law or fact.  The court therefore balances the

28   /////

                                              16

1    common issues against the individual issues to determine whether common questions

2    predominate.

3                        a)        Affirmation of Fact or Promise or Description of the Goods

4              The parties do not dispute that the written warranty in question here governs Dura-

5    Loc's agreement with each of its customers, and with the exception of the $400 service fee and

6    original-purchaser notice provisions, essentially the same warranty was in force throughout the

7    proposed class period.  Each putative class member's claim therefore depends on the effect of the

8    same promise: that the tiles are "UV-resistant" as defined in the warranty.  The warranty's

9    existence and scope are common questions of fact, and the warranty's application to the tiles is a

10   common question of law.

11                       b)        Basis of the Bargain

12             Section 2313 "creates a presumption that the seller's affirmations go to the basis of

13   the bargain."  *Weinstat*, 180 Cal. App. 4th at 1227.  This means that when the seller presents the

14   buyer with an express, written warranty, the seller's argument that the warranty was not part of

15   the deal between the two is unpersuasive.  *See In re MyFord Touch Consumer Litig.*, 46 F. Supp.

16   3d 936, 973 (N.D. Cal. 2014).  The written warranty's presence obviates any individual

17   determination of whether the warranty formed the "basis of the bargain" between each class

18   member and Dura-Loc.

19             Here the proposed class definition sweeps in more than original purchasers of

20   Dura-Loc tiles.  It includes "[a]ll individuals and entities that own homes or other structures

21   located in the State of California on which Dura-Loc [shingles] were installed . . . ."  Mem

22   P. & A. at 10.  In the face of this definition, section 2313's presumption lacks persuasive force

23   with respect to those putative class members who purchased buildings on which the tiles were

24   already installed.  Dura-Loc's warranties do anticipate applicability to subsequent purchasers, but

25   these provisions do not address whether, in the mind of the later purchaser, the warranty was part

26   of the bargain.  It can hardly be said that the warranty's promises formed the basis of any bargain

27   between Dura-Loc and these subsequent purchasers if they were not parties to a contract with

28   Dura-Loc.  *See, e.g.*, *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 546 (C.D. Cal. 2012).

1           The disjunction between Dura-Loc and secondary purchasers may alternatively be

2 described as a lack of contractual privity.  California courts have recognized that the lack of

3 contractual privity may defeat an express warranty claim.  *Blanco v. Baxter Healthcare Corp.*,

4 158 Cal. App. 4th 1039, 1058–59 (2008) ("'The general rule is that privity of contract is required

5 in an action for breach of either express or implied warranty and that there is no privity between

6 the original seller and a subsequent purchaser who is in no way a party to the original sale.'"

7 (quoting *All W. Electronics, Inc. v. M-B-W, Inc.*, 64 Cal. App. 4th 717, 725 (1998))).  Privity is

8 not an absolute requirement, however.  The California Supreme Court long ago recognized that a

9 plaintiff's reliance on labels or advertising materials may provide necessary evidence of the

10 "basis for the bargain."  *See Tapia v. Davol, Inc.*, 116 F. Supp. 3d 1149, 1160–61 (2015) (citing

11 *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 696 (1954)).[3]

12           That said, the plaintiffs have described a common means of proving secondary

13 purchasers' reliance.  Civil Code section 1797.94 provides that warranties "subject to this chapter,

14 shall inure to the benefit of, and shall be directly enforceable by, all subsequent purchasers and

15 transferees of the residential structure, without limitation . . . ."  Cal. Civ. Code § 1797.94.[4]  The

16 words "this chapter," as used in that section, refer to California Civil Code sections 1797.90 to

17 1797.96.  Section 1797.90 provides that the chapter "shall apply to all contracts and warranties

18 for roofing materials used on a residential structure . . . and to all contracts and warranties for the

19 installation, repair, or replacement of all or any portion of the roof of a residential structure . . . ."[5]

20

---

21          [3] Some other exceptions may also exist, for example, when the product in question is a
food or drug.  *See, e.g., Tapia*, 116 F. Supp. 3d at 1160–61.  Those exceptions are not relevant

22 here.

23          [4] The same section allows disclaimer of transferability, but only if the provision meets
certain formatting requirements that the warranties here do not.

24          [5] The court also concludes these sections may apply outside the context of the Song-
Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1790–1795.8, first enacted in 1970.  *See*

25 1970 Cal. Legis. Serv. Ch. 1333, p. 2478, § 1.  The chapter in which sections 1797.90 to 1797.96
are found was added in 1993 by independent legislation, *see* 1993 Cal. Legis. Serv. Ch. 835

26 (West), and a California Court of Appeal has understood sections 1797.90 to 1797.96 to be

27 independent of the Song-Beverly Act.  *See Hicks v. Superior Court*, 115 Cal. App. 4th 77, 8 Cal.
Rptr. 3d 703, 712 (Jan. 22, 2004), *review granted and opinion superseded*, 89 P.3d 732 (Cal.

28 2004), *review dismissed*, 129 P.3d 321 (Cal. 2006).

1   There remains the question of whether section 1797.94 applies to a claim under the California

2   Commercial Code.  It is a question of first impression, as no court has interpreted section

3   1797.94.  However it may be resolved, it is susceptible to adjudication by common facts and

4   argument.  This element therefore presents a common question.

5                                   c)      Breach

6               "An express warranty is a term of the parties' contract."  *Asghari v. Volkswagen*

7   *Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1333 (C.D. Cal. 2013).  It is "a contractual promise from

8   the seller that the goods conform to the promise."  *Daugherty v. American Honda Motor Co.,*

9   *Inc.*, 144 Cal. App. 4th 824, 830 (2006)).  "A seller may limit its liability for defective goods by

10  disclaiming or modifying a warranty."  *Id.*

11              As noted above, the warranty in question here is common to the class, and the

12  plaintiffs have submitted evidence that shows the Dura-Loc shingles were all manufactured using

13  the same allegedly defective design.  Whether the tiles were in fact UV-resistant therefore appears

14  a common question of law and fact apt for resolution by class action.

15              But the warranty also conditions Dura-Loc's liability.  The "warranty shall not be

16  applicable . . . if the purchaser refused to permit Dura-Loc to examine the goods to ascertain the

17  nature of the defect."  Class Member Decl. No. 1 (Beck), Ex. A, ECF No. 81-18.  The warranty

18  obligates a purchaser to "notify Dura-Loc of any and all claims arising under the disclaimer of

19  warranty within thirty (30) days after acceptance of the goods or discovery of the alleged defect."

20  *Id.*  The notice must be in writing, and "[f]ailure to so notify may invalidate these warranties."  *Id.*

21  Should the defect manifest itself later, "the Purchaser . . . shall notify Dura-Loc in writing of any

22  manufacturing defect within thirty days following its discovery and shall submit with such

23  notification proof of the date of purchase and installation."  *Id.*  For some class members, but not

24  all, Dura-Loc required a $400 service fee, and some were required to register their purchase.  *See*

25  Wilson Decl. Ex. A.  These are necessarily individualized inquiries.

26              The plaintiffs argue these issues pertain to class membership or damages, not

27  predominance.  Reply at 13–14.  Their argument conflicts with the class definition proposed: "All

28  individuals and entities that own homes or other structures located in the State of California on

1   which Dura-Loc Roofing Systems Limited's Continental, Shadow line, or Wood Shake stone

2   coated steel roof shingles were installed during the period of time beginning July 1, 1996 through

3   May 12, 2006." Mot. at 10. If the class includes any Californian who owns a home or structure

4   with Dura-Loc products on the roof, then compliance with the warranty is irrelevant for purposes

5   of class membership.

6           Neither may the plaintiffs supplant the warranty's notice provisions with statutory

7   notice requirements. *See* Reply at 15. Their argument incorrectly equates statutory notice

8   requirements with the terms of an express, written warranty. *Cf., e.g.*, *Keegan*, 838 F. Supp. 2d

9   at 950 & n.61 (discussing statutory notice requirement and citing, *inter alia*, Cal. Com. Code

10  § 2607(3)(A)). The court is aware of no authority that prohibits a manufacturer from offering an

11  express, limited warranty that imposes a notice requirement different from that required by the

12  default California rule.

13          This element therefore presents individualized questions.

14                  d)      Damages

15          Each plaintiff must prove he or she suffered damages as a result of Dura-Loc's

16  breach. *See Asghari*, 42 F. Supp. 3d at 1333; *Williams*, 185 Cal. App. 3d at 142. Here, the

17  putative class includes both those whose tiles have begun to degrade and those whose tiles may

18  remain intact, and therefore it includes both those who have already suffered an injury and those

19  who may suffer an injury in the future.[6] The inclusion of class members who have not suffered

20

21          _____

               [6] Metals USA articulates this argument in terms of each plaintiff's standing under
22  Article III. This argument is misplaced. "'In a class action, standing is satisfied if at least one
    named plaintiff meets the requirements. . . . Thus, we consider only whether at least one named
23  plaintiff satisfies the standing requirements. . . .'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d
    974, 985 (9th Cir. 2007) (en banc).

24          Admittedly, some confusion has arisen in recent years on this point. *See Waller v.
    Hewlett-Packard Co.*, 295 F.R.D. 472, 476 (S.D. Cal. 2013) (citing *Mazza v. Am. Honda Motor
25  Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("No class may be certified that contains members lacking
    Article III standing." (citations, quotation marks, and alteration omitted)). Recognizing this
26  confusion, the *Waller* court carefully considered the Ninth Circuit's precedents and rejected the
    rule of *Mazza*. 295 F.R.D. at 479–80. Other district courts have concluded similarly. *See, e.g.*,
27  *Moore v. Apple Inc.*, 309 F.R.D. 532, 541–42 (N.D. Cal. 2015) (collecting cases); *Rivera v.
    Holder*, 307 F.R.D. 539, 549 n.5 (W.D. Wash. 2015) (same).

28

1    injuries may demonstrate the overbreadth of the proposed definition and may be symptomatic of a

2    claim's individualized nature.  *See Moore*, 309 F.R.D. at 542.  That said, as noted above, the

3    Ninth Circuit has recently confirmed that a defect need not manifest itself before the class is

4    certified, *see Baker*, 797 F.3d at 614; *Wolin*, 617 F.3d at 1173; and (2) individual questions of

5    damages do not preclude class certification, *see, e.g.*, *Vaquero v. Ashley Furniture Indus., Inc.*,

6    ___ F.3d ___, 2016 WL 3190862, at *3–4 (9th Cir. June 8, 2016).

7                              e)        Statute of Limitations

8            California Commercial Code section 2725 governs the limitations period for

9    breaches of express warranty under section 2313.  Under that section, "[a]n action for breach of

10   any contract for sale must be commenced within four years after the cause of action has accrued.

11   By the original agreement the parties may reduce the period of limitation to not less than one year

12   but may not extend it."  Cal. Com. Code § 2725(1).  "A breach of warranty occurs when tender of

13   delivery is made, except that where a warranty explicitly extends to future performance of the

14   goods and discovery of the breach must await the time of such performance the cause of action

15   accrues when the breach is or should have been discovered."  *Id.* § 2725(2).

16           Here, "the warranty explicitly extends to future performance"; that is, the warranty

17   extends twenty-five years, and a purchaser could not reasonably have discovered the tiles' alleged

18   susceptibility to damage by UV radiation before the tiles began shedding granules.  The

19   limitations period is therefore four years.  But section 2725 also allows the parties to contract for

20   a limitations period as short as one year.  And that is what Dura-Loc and the putative class

21   members did.  *See, e.g.*, Class Member Decl. No. 1 (Beck), Ex. A, ECF No. 81-18 ("Any and all

22   claims, causes of action, suits, complaints, or petitions asserting a claim arising out of the sale of

23   these roof products, shall be brought within a period of one (1) year from the date on which the

24   purchaser discovers the alleged manufacturing defect, and the purchaser waives all statutory and

25   common law periods of limitations.").

26

27           In any event, it does not seem the *Mazza* panel could have overruled the en banc *Bates*
     opinion.  *See, e.g.*, *United States v. Camper*, 66 F.3d 229, 232 (9th Cir. 1995) ("[O]nly a panel
28   sitting en banc may overturn existing Ninth Circuit precedent.").

Several putative class members submitted declarations averring their discovery of defective tiles outside the applicable limitations period.  *See, e.g.*, Class Member Decl. Nos. 11, 23, 33, ECF Nos. 88-19, -21, -23.  Metals USA asserts this shortcoming dooms the motion for certification, but longstanding Ninth Circuit precedent provides otherwise: "The existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones." *Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975); *accord, e.g.*, *Pace v. Quintanilla*, 308 F.R.D. 644, 648 (C.D. Cal. 2015).  That is, "[c]lass certification . . . is also not precluded by the need to address individual statute of limitations defenses," *Grays Harbor Adventist Christian Sch. v. Carrier Corp.*, 242 F.R.D. 568, 573 (W.D. Wash. 2007), but individual questions of compliance with the relevant statute of limitations nonetheless weigh against certification in terms of predominance, *see, e.g.*, *Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976) ("[O]ur examination of the record in the instant case convinces us that, even if there exists questions [sic] of individual compliance with the [applicable] statute of limitations, they are not sufficient, on balance, to negate the predominance of the common issue.").

f)      Manufacturing Defect or Design Defect

Metals USA argues the defect in question is not actually attributable to the common design elements argued in the plaintiffs' motion; rather, a manufacturing defect is to blame.  If this is true, it argues, then a class of all those who purchased Dura-Loc products should not be certified because the plaintiffs have offered no proof that each tile was defectively manufactured.  In support of this theory, it presents evidence that the overwhelming majority of roof tiles manufactured were not defective.  The plaintiffs protest Metals USA's reliance on this theory of manufacturing defect because it previously disclaimed the evidence it now relies on.

However this evidentiary conflict may be resolved, it is not a question of commonality, but of the merits of the plaintiffs' claims.  The plaintiffs argue the tiles are defective because they are not UV resistant as promised.  The defendant may test the nature and origin of any defect through discovery, summary judgment, and trial, and the contest may be resolved by generalized evidence.  *See, e.g.*, *Wolin*, 617 F.3d at 1173 ("[The defendant] argues

22

1   that the evidence will demonstrate that the [products] do not suffer from a common defect, but

2   rather, from tire wear due to individual facts such as driving habits and weather. . . . What [the

3   defendant] argues is whether class members can win on the merits.  For [the plaintiffs'] claims

4   regarding the existence of the defect and the defendant's alleged violation of consumer protection

5   laws, this inquiry does not overlap with the predominance test.").  Similarly, the rareness of a

6   defect's manifestation is not dispositive.  *See, e.g.*, *Baker*, 797 F.3d at 609 (a class could be

7   certified despite the fact that only 0.4 percent of purchasers reported the defect).

8               g)     <u>Successor Liability</u>

9         Finally, although neither party directly raises the argument, Metals USA's liability

10   as successor to Dura-Loc is not yet established.  That issue is a question of law and fact common

11   to every putative class member.

12             h)     <u>Commonality and Predominance—In Conclusion</u>

13         In sum, the plaintiffs have identified four central and common questions of law or

14   fact: (1) whether the limited warranty governs their claims; (2) whether the tiles suffered from a

15   common design defect; (3) whether the alleged defect meant the tiles were not "UV resistant" as

16   promised in the written warranty; and (4) whether Metals USA is liable under an exception to the

17   ordinary rules of successor liability.  For class members who are original purchasers, the plaintiffs

18   have also shown the warranty formed the basis of the bargain, and they have proposed a common

19   means of proving that subsequent purchasers also relied on the express warranty.  These common

20   issues predominate.

21         As described above, two questions are not subject to common proof.  First, class

22   members must demonstrate their compliance with the terms of the written warranty.  This

23   question is possible to resolve by submission of affidavits or other proof of compliance, and

24   courts in the Ninth Circuit regularly hold that a class may be certified despite the plaintiffs'

25   reliance on affidavits to show class membership.  *See, e.g.*, *Krueger v. Wyeth, Inc.*, No. 03-2496,

26   2015 WL 5839197, at *6 (S.D. Cal. Oct. 7, 2015); *Thurston v. Bear Naked, Inc.*, No. 11-2985,

27   2013 WL 5664985, at *3 (S.D. Cal. July 30, 2013); *Ries v. AriZona Beverages USA LLC*, 287

28   F.R.D. 523, 535 (N.D. Cal. 2012)).  In *Ries v. AriZona Beverages*, for example, the defendants

1 argued certification was improper because the court would have no way to test objectively

2 whether a person purchased the allegedly defective product, a can of tea, during the class period.

3 287 F.R.D. at 535.  The court dismissed this argument, remarking that if it were upheld, "there

4 would be no such thing as a consumer class action."  *Id.*  Although *Ries* and similar cases dealt

5 with the question of class membership, whereas in this case the question is one of liability, the

6 background principle is the same: some claims are susceptible to class litigation, despite

7 administrative difficulties, when core questions of liability predominate over those difficulties.

8         Second, each class member's compliance with the applicable statute of limitations

9 is necessarily an individualized inquiry.  But courts in this circuit have repeatedly confirmed that

10 classes may be certified despite questions of the class members' compliance with the applicable

11 statute of limitations.  *Arthur Young & Co. v. U. S. Dist. Ct.*, 549 F.2d 686, 696 (9th Cir. 1977);

12 *Williams*, 529 F.2d at 1388; *Cameron*, 547 F.2d at 478; *Pace*, 308 F.R.D. at 648; *Cohen v.*

13 *Trump*, 303 F.R.D. 376, 388 (S.D. Cal. 2014).

14         In sum, the limited warranty, the nature of the alleged defect, and Metals USA's

15 successor liability are the core issues of this case, all of which may be addressed by common

16 evidence and proof.  These issues predominate over the individualized issues Metals USA has

17 identified.

18         E.    <u>Superiority</u>

19         Rule 23(b)(3) requires a court find a class action is the "superior" method of

20 resolution.  This constraint is meant to lead the court "to assess the relative advantages of

21 alternative procedures for handling the total controversy."  Fed. R. Civ. P. 23 advisory

22 committee's note 1966 amendment.  Superiority is determined by considering, for example,

23         (A) the class members' interests in individually controlling the
        prosecution or defense of separate actions;

24

25         (B) the extent and nature of any litigation concerning the
        controversy already begun by or against class members;

26         (C) the desirability or undesirability of concentrating the litigation
        of the claims in the particular forum; and

27

28 /////

1   (D) the likely difficulties in managing the class action.

2   *Id.*; *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190–92 (9th Cir. 2001).

3   Here, Metals USA does not propose any alternative means of resolution of the

4   class members' claims, and the court is also aware of none.  Although some claims may prove

5   sizeable, considering the cost of replacing a roof, the cost of individual proof likely exceeds the

6   value of most claims, as litigation will call on relatively complicated proof and evidence.  No

7   other forum appears more advantageous, and no related case is pending.  The case is also no more

8   procedurally complicated than other certified consumer classes, where individual issues have

9   been set aside until common, core issues are first addressed, as described in the previous section.

10   Moreover, the court retains discretion to adjust the class definition or even decertify the class

11   should intractable, individualized questions later arise.  *See, e.g.*, *Falcon*, 457 U.S. at 160 ("Even

12   after a certification order is entered, the judge remains free to modify it in light of subsequent

13   developments in the litigation.").  A class action is the superior means of litigating this case.

14   V.   <u>CONCLUSION</u>

15   The motion is GRANTED.  The class is defined as "All individuals and entities

16   that own homes or other structures located in the State of California on which Dura-Loc Roofing

17   Systems Limited's Continental, Shadowline, or Wood Shake stone coated steel roof shingles were

18   installed during the period of time beginning July 1, 1996 through May 12, 2006."

19   One class claim is certified: the second claim for breaches of express warranty

20   under California Commercial Code sections 2313 *et seq.*

21   The class excludes Metals USA and Dura-Loc and any of their corporate parents,

22   subsidiaries and affiliates, officers and directors, any entity in which Metals USA or Dura-Loc

23   has a controlling interest, the legal representatives, successors or assigns of any of these excluded

24   persons or entities, and plaintiffs' counsel in this action.  The class also excludes any person

25   whose claims in this action have been previously released against either Metals USA or

26   Dura-Loc.

27   Plaintiffs James Wilson and Jack White are appointed as class representatives, and

28   Gene Stonebarger and Richard Lambert are appointed class counsel.

25

1    This order resolves ECF No. 81.

2    IT IS SO ORDERED.

3  DATED:  July 1, 2016.

4

5

6  UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28