1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMES WILSON, an individual, and              No.  2:12-cv-568-KJM-DB
     JACK WHITE, an individual, on behalf of
12   themselves and all others similarly situated,

13              Plaintiffs,                          ORDER

14        v.

15   METALS, USA, INC., a Delaware
     Corporation, and DOES 1-100, inclusive,
16
                Defendant.
17

18

19              A class of homeowners sues a roofing tile manufacturer for allegedly defective

20   tiles.  Defendant Metals USA, Inc. ("Metals"), the alleged successor to the company that

21   manufactured the tiles, brings this motion for summary judgment or, in the alternative, partial

22   summary judgment.  Mot., ECF No. 102.  The representatives of the class, plaintiffs James

23   Wilson and Jack White, oppose the motion.  Opp'n, ECF No. 105.  Metals replied.  Reply, ECF

24   No. 106.  The court held a hearing on November 18, 2016, at which Richard Lambert appeared

25   for plaintiffs and Bartholomew Dalton, Adrian Sawyer and Frank Busch appeared for Metals.

26   Hr'g Mins., ECF No. 108.  As explained below, the court DENIES the motion.

27   /////

28   /////

I.    BACKGROUND

   A.    Procedural Background

      Plaintiffs filed the original complaint on March 5, 2012 against 604471 Ontario, Inc., a Canadian corporation formerly known as Dura-Loc Roofing Systems Limited ("Dura-Loc"), and Allan Reid, a principal of Dura-Loc.  Compl. at 1–2, ECF No.1.  After Dura-Loc filed for bankruptcy in Canada in April 2012, plaintiffs filed a first amended complaint on May 5, 2012, against Metals, the alleged successor of Dura-Loc, and Reid.  First Am. Compl. ("FAC") at 9 n.2, ECF No. 11.  Metals moved to dismiss for failure to state a claim on July 9, 2012, and Reid moved to dismiss for lack of personal jurisdiction on August 18, 2012.  ECF Nos. 15, 22.  The court granted Metals's motion, ECF No. 31, and *sua sponte* dismissed the complaint for failure to join 604471 Ontario, Inc. as a necessary party, ECF No. 34.  Plaintiffs filed a second amended complaint on May 8, 2013, against Metals only.  Second Am. Compl. ("SAC"), ECF No. 49.  The court denied Metals's motion to dismiss this complaint.  ECF Nos. 50, 57.

      Plaintiffs filed the operative third amended complaint on June 29, 2015, asserting four claims against Metals: (1) breach of express warranties under California Civil Code §§ 1790 *et seq.*; (2) breach of express warranties under California Commercial Code §§ 2313 *et seq.*; (3) violations of the California Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*; and (4) violations of California Unfair Competition Law, California Business and Professions Code § 17200.  Third Am. Compl. ("TAC") ¶¶ 48–55, ECF No. 78.  On July 5, 2016, the court granted plaintiffs' motion to certify their second express warranties claim for class treatment.  Mot. Class Cert., ECF No. 81; Cert. Order, ECF No. 93.[1]

      On September 4, 2016, Metals filed the instant motion for summary judgment or, in the alternative, partial summary judgment.  *See* Mot.

/////

/////

---

[1] Although the third amended complaint names a third plaintiff, Rita White, the court approved plaintiffs' motion to appoint only James Wilson and Jack White as class representatives.  *See* TAC ¶ 14; Mot. Class Cert. at 2; Cert. Order at 25.

B.    Evidentiary Issues

The parties raise several objections to each other's proffered statements of undisputed facts.  *See* Def.'s Statement of Undisputed Facts ("DSUF"), ECF No. 102-2; Pls.' Response to DSUF, ECF No. 105-1 (objecting to DSUF 1, 29); Pls.' Statement of Undisputed Facts ("PSUF"), ECF No. 105-1; Def.'s Objs., ECF No. 106-3 (objecting to PSUF 169, 184). The court does not rely on most of the material a party finds objectionable and therefore addresses only relevant objections below, in the course of reviewing the facts of the case.

C.    Factual Background

When considering a motion for summary judgment, the court relies on whatever facts are undisputed and otherwise considers the evidentiary record in the light most favorable to the party opposing the motion.  *See, e.g.*, *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1202 (9th Cir. 2016).  The following facts are not disputed unless otherwise noted.

1.    Dura-Loc's Tiles

A few details about Dura-Loc and its roofing tiles help set the stage.  Dura-Loc started its business in Ontario, Canada in 1984.  TAC Ex. D ("Reid Decl.") ¶ 15.  Between 1985 and 2006, Dura-Loc manufactured part-metal, part-stone, layered roofing tiles.  *Id.*; *see also* Stonebarger Decl. Ex. D, at MUSA 003923, ECF No. 81-3.  The tiles' top sides, which were the sides eventually exposed to the elements, were coated with crushed stone chips, granules of "Colorquartz Aggregate" manufactured by 3M.  *See* Dalton Decl. (Class Cert.) Exs. B, D, ECF No. 82-2.  Each tile is just over four feet wide and about fifteen inches long.  Stonebarger Decl. Ex. D, at MUSA 003923.  When installed on a roof, each tile overlaps with adjacent tiles to protect the structure below.  *Id.*

In 2006, the year Metals purchased Dura-Loc's assets, Dura-Loc employed about fifty people, and Allan Reid was Dura-Loc's president and director.  Reid Decl. ¶ 15.  Before the 2006 asset sale, Reid had been a member of Dura-Loc's board of directors for over ten years and owned about thirty percent of its voting shares.  *Id.* ¶ 18.

/////

/////

3

2.      Metals's Purchase of Dura-Loc's Assets

In May 2006, Metals purchased a majority of Dura-Loc's assets for $9.4 million. DSUF 1; *see also* TAC Ex. H ("Purchase Agreement"). At the time, the purchase price was nearly $1.6 million less than Dura-Loc's gross sales in 2005 and nearly $2.1 million less than Dura-Loc's projected total sales for 2006. PSUF 122–23.

Under the Purchase Agreement, Metals and Dura-Loc initially agreed to jointly administer a warranty program and share certain defined "Warranty Costs." DSUF 3. Metals and Dura-Loc split the Warranty Costs using a sliding scale, with Dura-Loc agreeing to pay an increasing share of the Warranty Costs as the total annual claims increased. DSUF 4–5; *see also* Purchase Agreement §§ 2.9–2.10. At the extremes, Metals agreed to pay 100 percent of the total warranty costs between $0 and $65,000 in annual claims, and Dura-Loc agreed to pay 100 percent of the total warranty costs for total annual claims above $260,000. *Id.* Metals's maximum possible annual warranty cost-sharing liability was $161,000. DSUF 4. The parties dispute whether, aside from the cost-sharing arrangement under the Purchase Agreement, warranty liability for Dura-Loc tiles rested solely with Dura-Loc. *Compare* DSUF 6, *with* PSUF 133.

In addition, as part of the Purchase Agreement, Metals paid $500,000 into an escrow account to satisfy any future claims Metals might raise for breaches of the covenants, representations and warranties in the Purchase Agreement, or Warranty Costs incurred outside the warranty cost sharing agreement. PSUF 137. As part of the Purchase Agreement, Metals also employed Reid, one of Dura-Loc's principals, whose responsibilities with Metals included investigating warranty claims. PSUF 138.

Before executing the Purchase Agreement, Metals reviewed Dura-Loc's operations and information about the warranty claims Dura-Loc's purchasers had made. PSUF 140. Metals's due diligence report reflects the following number of warranty claims in each year reviewed: 56 claims in 2000; 40 claims in 2001; 43 claims in 2002; 43 claims in 2003; 37 claims in 2004; and 77 claims in 2005. TAC Ex. Q. Metals also reviewed information regarding seven pending lawsuits against Dura-Loc, which Metals concluded were "all . . . related to product quality or installation." PSUF 142; TAC Ex. L. In one suit, a purchaser alleged the granular

coating of his tiles was coming off prematurely due to a manufacturing or materials defect.  PSUF
143; TAC Ex. M.

        After the asset sale, Dura-Loc ceased manufacturing, marketing and selling the
tiles and changed its name to 604471 Ontario Inc.  PSUF 139; Reid Decl. ¶ 14.

        3.     Metals's Claims against Dura-Loc

        Soon after the asset sale, conflict arose between Dura-Loc and Metals.  Metals
became aware of seventy-four total warranty claims on the tiles in 2006, nearly all of which were
for granule loss.  PSUF 147; TAC Exs. Q, T, K.  Metals alleged that Dura-Loc, Reid and Spriet,
another principal of Dura-Loc whom Metals never employed, all had significantly
underrepresented the extent of customer complaints and warranty claims regarding Dura-Loc
products in breach of their contractual obligations to Metals under the Purchase Agreement.
PSUF 151; TAC Exs. B, R.  Specifically, according to Metals, Dura-Loc underrepresented the
extent of its tile degranulation issues.  PSUF 148.

        Around June 1, 2007, approximately a year after the Purchase Agreement was
signed and apparently prior to any litigation, Metals settled with Dura-Loc, Reid and Spriet
("Settlement Agreement").   DSUF 7.  Under the Settlement Agreement, Dura-Loc paid Metals
$450,000 (CDN[2]) and assumed sole administrative responsibility for "handling and resolving"
outstanding, pending and future warranty claims.  DSUF 8; TAC Ex. U.  Dura-Loc, Reid and
Spriet also released Metals from various obligations in the Purchase Agreement, such as
responsibility for costs associated with warranty administration, and Metals released Dura-Loc,
Reid and Spriet from liability for certain alleged misrepresentations and nondisclosures.  DSUF 8;
TAC Ex. U.

        After the parties executed the Settlement Agreement, problems with the
performance by Dura-Loc, Reid and Spriet of their ongoing warranty obligations persisted.  On
April 26, 2011, Metals filed a suit in the Ontario (Canada) Superior Court of Justice claiming
damages for lost sales, injury to Metals's reputation and goodwill and legal costs.  DSUF 9–10.

---

[2] CDN stands for Canadian dollars.

Metals's allegations included its dissatisfaction with Dura-Loc's disclosure of relevant warranty issues. DSUF 11; TAC Ex. B at 13–15. A little over a month later, the parties amended their earlier Settlement Agreement ("Amendment"). DSUF 12. Under the Amendment, Metals received $845,055.75 (CDN): $345,055.75 (CDN) from the remaining Escrow Amount, $350,000 (CDN) from Dura-Loc, and $150,000 (CDN) from Reid and Spriet. DSUF 12; PSUF 167. Metals released Reid and Spriet from all liability. DSUF 12; TAC Ex. Z.

### 4. Plaintiffs' Purchase of the Tiles

In June 2004, plaintiff James Wilson purchased Dura-Loc's Flat Panel metal roofing tiles for his single-family home in Roseville, California. Wilson Decl. ¶ 2, ECF No. 81-10. The tiles came with a twenty-five year warranty. *Id.* Ex. A ("Wilson Warranty"), ECF No. 81-11. In or about June 2011, Wilson noticed for the first time the tiles on his roof had deteriorated and lost much of their original color, coating and texture. *Id.* ¶¶ 4–5. At that time, Wilson contacted Metals about the deterioration. *Id.* ¶ 4. Metals explained it did not manufacture the tiles and instructed Wilson to contact Ontario 604471 as the successor to Dura-Loc. *Id.* Ex. C ("Metals Letter"), ECF No. 81-13. Wilson contacted Ontario 604471, which demanded a $400 deposit before investigating his claim. *Id.* Ex. D ("Ontario 604471 Letter"), ECF No. 81-14. Wilson refused to pay the deposit. DSUF 47.

Plaintiff Jack White purchased the same style of Dura-Loc tiles in June 2004 for his home in Orangevale, California. White Decl. ¶ 2, ECF No. 81-16. The tiles came with a twenty-five year warranty. *Id.* In or about June 2011, White noticed the tiles had deteriorated, in much the same way as had Wilson's tiles, having lost their original color, coating and texture. *Id.* ¶¶ 4–5. White recalls receiving a letter asking for $400 to inspect the roof, DSUF 43, but White did not have his roof inspected, DSUF 45.

### 5. The Dura-Loc Warranties

Plaintiffs' case turns on whether plaintiffs can enforce their warranties against Metals as the alleged successor to Dura-Loc. Wilson and White, who both purchased the Dura-Loc tiles in 2004, have substantially similar warranties. *See* DSUF 28, 29–37. However, many class members who purchased their tiles earlier have notably different warranties. *See id.* There

are three versions of warranty across the class.  *See* Dalton Decl. Ex. E ("2004–06 Warranty"),

ECF No. 102-8; Lambert Decl. Ex. 34 ("2001–03 Warranty"), ECF No. 105-6 at 2–3; Lambert

Decl. Ex. 11 ("1996–2000 Warranty"), ECF No. 105-4.[3]  The court discusses the 2004–06

Warranty here, and addresses the few relevant differences in the 2001–03 Warranty and the

1996–2000 Warranty, respectively, in the analysis section of this order.

      Dura-Loc's 2004–06 Warranty promises "[t]hat, for a period of 25 years following

proper installation, the surface coating of the Dura-Loc Product shall be UV resistant* and will

not deteriorate as the result of a manufacturing defect to the extent that the appearance of the roof

is substantially affected."  DSUF 28; 2004–06 Warranty at 1 (asterisk in original).  The asterisk

references a "note" that explains "[a]t the date of installation, the coating will meet or exceed

industry standards when tested to ASTM 4214 - 89 standards given the service life of the roof."

DSUF 29.  The Warranty goes on to say that "taking all the circumstances into account, Dura-Loc

will, at its sole option, either repair or replace the affected Product . . . provided in all

circumstances that Dura-Loc's aggregate liability to all persons with respect to such Product shall

be limited to an amount actually paid."  DSUF 31.  Thus, Dura-Loc's promise is that the roofing

tile should have certain characteristics, and if it does not, its owner will be entitled to the specified

repair, replacement or repayment remedies subject to the remaining terms of the limited warranty.

DSUF 32.  To be covered by the Warranty, the purchaser must register the Warranty within

ninety days of the tile installation; failure to register within that window reduces the warranty

period to only two years from the installation date.  DSUF 30.

      The 2004–06 Warranty has a section entitled "How to Make a Claim," which

explains Dura-Loc must be notified of all warranty claims within thirty days of either acceptance

of the tiles or discovery of the defect.  DSUF 34.  All warranty claims must include a copy of the

Warranty, proof of the date of purchase, proof of installation, and a $400 refundable service fee

for Dura-Loc to investigate the complaint.   2004–06 Warranty at 2.  Any legal proceeding based

---

[3] In the parties' Joint Statement for the Final Pretrial Conference, filed after the court
submitted this motion, the parties agree Dura-Loc offered three express warranties from 1996
through 2006.  Joint Statement ¶¶ 13–16, ECF No. 113.  The court takes judicial notice of this
stipulation.  Fed. R. Evid. 201.

on the Warranty must be brought within one year of Dura-Loc's corrective action or denial of the owner's claim. *Id.*

    D.    <u>Metals's Motion</u>

Metals moves for summary judgment on all claims and, in the alternative, for partial summary judgment on the first and second claims. *See generally* Mem. P. & A., ECF No. 102-1. Metals moves for summary judgment on all claims on the grounds that Metals cannot be held liable for Dura-Loc's actions under plaintiffs' "fraudulent transfer" theory of successor liability. *Id.* at 18–24. Metals alternatively moves for partial summary judgment on the first and second claims on the grounds that the applicable warranty does not cover design defects and, even if it does, plaintiffs have not shown the product violates the "UV resistant" requirement of the warranty. *Id.* at 24–26. Metals also moves for partial summary judgment on the first and second claims against many class members who Metals argues failed to comply with the warranties' procedural requirements, *id.* at 26–28, and against secondary purchaser class members who Metals argues cannot show reliance on their warranty, *id.* at 28–29. Below, after addressing the relevant standard for Metals's motion, the court turns to each of Metals's arguments.

II.    <u>SUMMARY JUDGMENT</u>

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do not establish the absence

or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The nonmovant] must do more than simply show that there is some metaphysical doubt as to the material facts."). Moreover, "the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86 (9th Cir. 2010). However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

The Supreme Court has taken care to note that district courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*,

477 U.S. at 255.  A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial."  *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be the case "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

III.    SUCCESSOR LIABILITY

Metals moves for summary judgment on all claims on the grounds that Metals cannot be held liable for Dura-Loc's actions under plaintiffs' "fraudulent transfer" theory of successor liability.  Mem. P. & A. at 18–24.

A.    Successor Liability Generally

As the court already has recognized, because the court sits here in diversity, California substantive law governs the issue of successor liability.  *See* Order Oct. 12, 2012 at 18, ECF No. 31 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

In California, when a corporation purchases or otherwise acquires the assets of another corporation, the acquiring corporation does not ordinarily assume the selling corporation's debts and liabilities.  *See, e.g.*, *Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust*, 95 Cal. App. 4th 1182, 1188 (2002).  This general "successor nonliability" rule does not apply where: "(1) there is an express or implied agreement of assumption; (2) the transaction amounts to a consolidation or merger of the two corporations; (3) the purchasing corporation is a mere continuation of the seller; or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."  *Ray v. Alad Corp.*, 19 Cal. 3d 22 (1977); *Pierce v. Riverside Mortg. Securities Co.*, 25 Cal. App. 2d 248 (1938).  In *Ray*, the California Supreme Court recognized a fifth exception, known as the "product line successor" rule, which is unique to the strict products liability context and not relevant here.  *See, e.g.*, *Chaknova v. Wilbur-Ellis Co.*, 69 Cal. App. 4th 962, 969–71 (1999).

Successor liability is an equitable doctrine.  *See, e.g.*, *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1330 (2012).  Issues relevant to successor liability are to be examined

"on their own unique facts" and "[c]onsiderations of fairness and equity apply." *CenterPoint Energy, Inc. v. Superior Court*, 157 Cal. App. 4th 1101, 1122 (2007). The question of successor liability is ordinarily a question for the judge, not a jury, to decide. *Rosales v. Thermex–Thermatron, Inc.*, 67 Cal. App. 4th 187, 196 (1998); *but see Cleveland*, 209 Cal. App. 4th at 1325 (2012) (affirming jury finding of successor liability where issues for judge and jury were intertwined).

Here, plaintiffs rely exclusively on a fraudulent transfer theory of successor liability. In light of the equitable nature of successor liability, the court presumes Metals may be liable for Dura-Loc's debts and liabilities so long as, after considering the "unique facts" of the case and applying "considerations of fairness and equity," *CenterPoint Energy*, 157 Cal. App. 4th at 1122, the court finds the transfer of assets was "for the fraudulent purpose of escaping liability for the seller's debts," *Ray*, 19 Cal. 3d at 28. Despite the equitable and fact-intensive nature of the doctrine, however, Metals argues the fraudulent transfer theory strictly requires (1) fraud on the part of the corporate buyer; (2) payment by the buyer of less than fair market value for assets; and (3) multiple shared employees or shareholders between the buyer and seller. Mem. P. & A. at 18–24. As discussed below, finding no such requirements, the court concludes plaintiffs may proceed under their fraudulent transfer theory.

### 1.  The Corporate Buyer's Fraud

A successor may be liable where "the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Ray*, 19 Cal. 3d at 28. The California Supreme Court's language in *Ray* does not make clear whether the fraudulent purpose must be the buyer's or the seller's. In arguing buyer's fraud is necessary, Metals points to *Pierce v. Riverside Mortg. Securities Co.*, in which a California appellate court rejected a fraudulent transfer theory where "[n]o fraud on the part of defendant [i.e. the buyer] is even suggested." 25 Cal. App. 2d at 256.

*Pierce* does not support a rigid requirement of buyer's fraud for several reasons. The language Metals quotes is part of a long list of the *Pierce* court's considerations, including whether the buyer's and seller's interests were aligned, *id.* at 255–56, and whether the seller

continued to operate after the sale, *id.* at 256; this language is dicta. Other dicta from *Pierce* instead focuses on the seller, whose "good faith" in making the sale would undermine an attempt to impose successor liability. *Id.* at 257. The *Pierce* court simultaneously discusses the applicability of all four recognized successor liability exceptions, and it is not clear which portions of the discussion apply to which exception. Thus, instead of standing for a strict requirement of buyer's fraud, *Pierce* is consistent with a flexible approach of looking to the "unique facts" of each case and applying "considerations of fairness and equity." *CenterPoint Energy*, 157 Cal. App. 4th at 1122. The court has not located, and the parties do not cite, any other case that resolves this question. Accordingly, the court will evaluate whether for purposes of summary judgment there was a "fraudulent purpose" on either party's part. *See, e.g.*, *Nelson v. Tiffany Indus., Inc.*, 778 F.2d 533, 537 (9th Cir. 1985) (looking for evidence of a "collusive agreement" between both corporations).

## 2.   Less Than Fair Market Value

As explained in *Ray*, California courts generally require a complaining party to show the alleged successor paid inadequate consideration to proceed under a mere continuation theory. 19 Cal. 3d at 29. Here, Metals argues a similar requirement is necessary to support plaintiff's fraudulent transfer theory. Mem. P. & A. at 15.

One case, *Cleveland v. Johnson*, 209 Cal. App. 4th at 1315, greatly undermines Metals's argument. In *Cleveland*, a California Court of Appeal considered whether a jury[4] erred in finding defendant Internet Specialties West ("IS West"), a spin-off entity of Interactive Strategies, Inc. ("ISI"), liable as a successor to ISI where there was no evidence IS West paid inadequate consideration. Noting the equitable nature of the successor liability doctrine, the appellate court upheld successor liability under two theories. *Id.* at 1333–35. First, the court upheld liability under a mere continuation theory, reasoning *Ray* itself found liability "only upon a showing of *one or both*" of the factual elements of inadequate consideration and common

---

[4] The trial court rejected defendants' attempt to bifurcate the trial into separate trials of equitable issues (e.g., successor liability) and other issues because "both the equitable and factual issues are intertwined." 209 Cal. 4th at 1325.

12

officers, directors or stockholders. *Id.* at 1334 (emphasis in original) (citing *Ray*, 19 Cal. 3d at 29). Thus, even for a mere continuation theory, inadequate consideration was not strictly required. *Id.* Second, and alternatively, the court upheld successor liability under a fraudulent transfer theory even though this theory was not presented to the jury. *Id.* As the appellate court reasoned, the jury's imposition of punitive damages meant it necessarily found fraud on the part of IS West and an individual defendant who organized the transaction, and that such a finding supported liability. *Id.* Because the court upheld successor liability under a fraudulent transfer theory without a finding of inadequate consideration, *Cleveland* is fatal to Metals's contention that inadequate consideration is required here.

### 3. Shared Employees Between Buyer and Seller

As noted, the California Supreme Court has found that courts generally require a showing of one or both factual elements for a mere continuation theory of successor liability: (1) inadequate consideration; and/or (2) one or more persons were officers, directors or stockholders of both corporations. *Ray*, 19 Cal. 3d at 29. Metals argues the predecessor and successor entities must similarly share common employees to support a fraudulent transfer theory. Mem. P. & A. at 23–24 (citing *Franklin v. USX Corp.*, 87 Cal. App. 4th 615, 628 (2001); *Maloney v. Am. Pharm. Co.*, 207 Cal. App. 3d 282, 288 (1988)). Both of Metals's cited authorities, however, are mere continuation cases that do not extend this requirement to a fraudulent transfer theory. Thus, the court need not address what level of ownership interest any such common employee must have. *Compare Ray*, 19 Cal. 3d at 28 (suggesting a single shared officer, director or stockholder may be sufficient), *and Maloney*, 207 Cal. App. 3d at 288 (suggesting the number of shared employees may be determinative), *with Franklin,* 87 Cal. App. 4th at 628 (suggesting "near complete identity of ownership, management or directorship" may be required).

In sum, the three requirements Metals argues must be established for a fraudulent transfer theory of successor liability to succeed, although relevant to the court's equitable determination of successor liability, are not required for plaintiffs' claims. Thus, the court next

examines successor liability on the case's "own unique facts" to determine if Metals has shown the absence of a genuine dispute as to those facts supporting plaintiffs' fraudulent transfer theory.

B.  Metals's Successor Liability

This is not the first time the court has addressed whether Metals can be found liable as Dura-Loc's successor.  At the motion to dismiss stage, the court reasoned that successor liability may be found under a fraudulent transfer theory based on Metals and Dura-Loc's entire course of conduct since 2006.  Order August 28, 2013, at 21, ECF No. 57.  As the court explained:

> [I]t is unclear that the successor liability inquiry should halt at the close of the asset sale, for the transactions between the parties continued thereafter. Metals USA twice initiated disputes against Dura-Loc, Reid, and Spriet for their malfeasance in handling warranty claims, and received well over one million dollars in settlement. Of the second settlement, $345,055.75 (CDN) came in the form of a clawback of escrowed funds, directly tying this transaction to the initial asset sale. The Settlement Agreement purported to relieve Metals USA of all responsibility for warranty claims, and the First Amendment to the Settlement Agreement sought to relieve Reid and Spriet of liabilities under the Purchase Agreement and Settlement Agreement. In other words, Dura-Loc was left to handle all warranty claims, despite abundant evidence that the firm was failing to honor warranty obligations. . . . In sum, an examination of the entire alleged course of post-sale conduct between Metals USA, Dura-Loc, Reid, and Spriet allows the court to draw the reasonable inference that . . . . Metals USA may have colluded with the other parties to leave injured Tile purchasers without a realistic means of redress.

*Id.* at 21–22 (internal quotations and citations omitted).  On this basis, the court denied Metals's motion to dismiss.

Plaintiffs now have supported their allegations with sufficient evidence to overcome Metals's motion for summary judgment on the basis of successor liability here.  As the record demonstrates, Metals likely knew about the tiles' defects early in its relationship with Dura-Loc.  Prior to the purchase of Dura-Loc assets, Metals reviewed documents associated with Dura-Loc's pending warranty claims.  PSUF 140.  Metals also had information regarding several lawsuits against Dura-Loc, all of which were "related to product quality or installation," including one that specifically alleged defect claims substantially similar to those presented here.  PSUF 142–43; TAC Exs. L, M.  In addition, Metals took careful steps to limit the amount it would need

14

to pay to cover any warranty claims, effectively capping its annual payments at $161,000. DSUF 4–5. A reasonable finder of fact could determine Metals was aware of the product defects and claims arising from them before entering into the Purchase Agreement in May 2006. Even if Metals did not appreciate the extent of the defects or the corresponding warranty claims and liability in 2006, Metals clearly knew about these problems after 2007, when Metals repeatedly settled claims against Dura-Loc regarding its representations and handling of warranty claims. PSUF 151; TAC Exs. B, R; DSUF 11.

Despite knowing about the problems relatively early on, Metals took steps that limited not only its own exposure but also purchasers' means of redress. Initially, Metals's purchase price of $9.4 million may have been grossly inadequate to cover the liability Dura-Loc retained under the Purchase Agreement. *See* Opp'n at 10. Plaintiffs estimate total liability for warranty claims between $10 million and $18.1 million. TAC ¶¶ 111–25. Metals, focusing on its argument of adequate consideration, does not directly address plaintiffs' calculation of inadequate payment to cover these liabilities. Mem. P. & A. at 20–21; Reply at 8. Even without plaintiffs' estimates, three undisputed facts could lead a reasonable trier of fact to find the purchase price was inadequate to cover Dura-Loc's liabilities. First, the Dura-Loc data Metals reviewed before the asset purchase project an estimated total of $1.5 million for warranty claims for 2006 alone. PSUF 148; TAC Exs. K, T. Given the several years of warranty claims, both before and after the asset sale, this amount could quickly exceed the $9.4 million purchase price. Second, from 2000 through 2005, Dura-Loc's annual gross sales increased substantially and steadily. PSUF 124. It is reasonable to expect warranty claims to increase as product sales increase. Thus, one could reasonably expect the annual warranty liability to exceed the $1.5 million projection. Third, the Settlement Agreement and Amendment substantially reduced whatever money was available to pay the warranty claims, leaving Dura-Loc with only $7.9 million to pay its creditors: $9.4 million less $1.5 million in settlement payments. Viewing this information together, a reasonable jury could conclude that at the time of the asset sale Metals knew about the mounting warranty claims and knew the purchase price would not cover warranty claims arising from them.

Two facts are particularly helpful to plaintiffs' fraudulent transfer theory here. First, Metals employed Reid, a former principal of Dura-Loc, under the Purchase Agreement. PSUF 138. Prior to execution of the Purchase Agreement, Reid was a former president and director of Dura-Loc, a long-term member of Dura-Loc's board of directors and owner of a third of the voting shares of Dura-Loc. Reid Decl. ¶¶ 15, 18. His responsibilities with Metals included handling the warranty claims associated with Dura-Loc's products. PSUF 138. He ultimately was relieved of his individual liability under the Purchase Agreement by the Settlement Agreement and its Amendment. DSUF 8, 12; TAC Exs. U, Z. Reid's employment forges a direct link between Dura-Loc and Metals, both of whom may have been seeking to avoid liability for the defective tiles. Second, the Amendment to the Settlement Agreement included a clawback provision under which Metals ultimately recovered whatever it had paid into escrow for its potential claims against Dura-Loc. DSUF 8; TAC Ex. U. This provision thus links the Purchase Agreement, under which Metals, Reid and Spriet agreed to share the warranty costs with Dura-Loc, and the Settlement Agreement and its Amendment, which left Dura-Loc with all liability and may have precipitated its bankruptcy.

Taken together, a reasonable trier of fact could find, based on this record, that Metals colluded with the other parties to leave injured purchasers without a realistic means of redress. Because such a finding would be sufficient to support a fraudulent transfer theory of successor liability, a genuine dispute exists as to whether Metals may be liable as the successor to Dura-Loc. Accordingly, the court DENIES Metals's motion for summary judgment as to all claims on the basis of successor nonliability.

IV.    LIABILITY UNDER THE WARRANTY

Metals moves, in the alternative, for partial summary judgment as to plaintiffs' breach of warranty claims (Claims 1 and 2) on several grounds. *See* Mem. P. & A. at 24–30. Metals argues: (A) plaintiffs have not shown the alleged defect constitutes a warranty violation; (B) plaintiffs and numerous class members have failed to comply with the applicable warranty's claim requirements; and (C) class members who are secondary purchasers have not shown reliance.

A.     <u>Warranty Violations</u>

Metals contends plaintiffs cannot show the alleged product defect violates their warranties. Mem. P. & A. at 25–26. Metals first argues each warranty covers only manufacturing defects, which precludes plaintiffs' design defect claim. *Id.*

"A manufacturing defect exists when an item is produced in a substandard condition. Such a defect is often demonstrated by showing the product performed differently from other ostensibly identical units of the same product line. A design defect, in contrast, exists when the product is built in accordance with its intended specifications, but the design itself is inherently defective." *McCabe v. Am. Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002) (citations omitted). "[A] manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty." *Horvath v. LG Elecs. Mobilecomm U.S.A., Inc.*, No. 3:11-CV-01576, 2012 WL 2861160, at *4–5 (S.D. Cal. Feb. 13, 2012).

Here, plaintiffs assert[5] only a design defect, not a manufacturing defect. Opp'n at 28:13–14. Thus, only if the warranties cover design defects may plaintiffs' claims survive summary judgment.

Metals's argument that the warranties cover only manufacturing defects can be rejected easily for two of the three warranties. The 2001–03 Warranty promises "[a]t the date of installation, . . . the surface coating is *UV resistant" and that, during the twenty-five year warranty period, no "surface coating of the Dura-Loc panels and /or trims shall deteriorate. . . ." 2001–03 Warranty. No language in the Warranty limits either of these promises to manufacturing defects. The 1996–2000 Warranty is substantially similar.[6] Like the 2001–03 Warranty, the 1996–2000 Warranty promises "the surface coating is *UV resistant" and that no "surface coating

---

[5] Although the operative complaint alleges a manufacturing defect and design defect, TAC ¶¶ 2, 30, 42, 149, plaintiffs have focused exclusively on their design defect theory at the class certification stage, Dec. 4, 2017 Hr'g Transcript at 20:7–9, ECF No. 92, and at this summary judgment stage, Opp'n at 28:13–14.

[6] The 1996–2000 Warranty provides, in relevant part, "Dura-Loc warrants that the surface coating is *UV resistant and that if during the period of 25 years form the date of this warranty, the surface coating of the Dura-Loc panels and /or trims shall deteriorate to the extent the appearance of the roof is substantially affected." 1996–2000 Warranty.

17

of the Dura-Loc panels and /or trims shall deteriorate" and does not limit either promise to manufacturing defects. 1996–2000 Warranty. Because the two older warranties make two promises about the product, and do not restrict those promises to manufacturing defects, plaintiffs may pursue their claims for a design defect under either. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (where warranty was not clearly limited to manufacturing defects and was a contract of adhesion, reasoning the "warranty must be construed to guarantee against both manufacturing and design defects").

Unlike the older warranties, the more recent warranty includes at least some limiting language. The 2004–06 Warranty promises "[t]hat, for a period of 25 years following proper installation, the surface coating of the Dura-Loc Product shall be UV resistant* and will not deteriorate as the result of a manufacturing defect to the extent that the appearance is substantially affected . . . ." DSUF 28; 2004–06 Warranty at 1. This warranty creates two apparent promises: that the tiles (1) "shall be UV resistant" and (2) "will not deteriorate." But the second promise is expressly limited to manufacturing defects. So plaintiffs' design defect claim may not derive from that second promise in the 2004–06 Warranty.

The question thus becomes whether plaintiffs' design defect claim can remain as to the first promise. To answer this question, the court must assess whether the first promise is independent from the second and thus escapes the second promises' limiting language. The choice of words suggests independence: the affirmative promise that the product "shall be UV resistant" is separate from the negative guarantee that it "will not deteriorate," which supports plaintiffs' interpretation that the two promises are distinct. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). On the other hand, as explained below, the record and the parties' briefing do not sufficiently define "UV resistant," and thus the court cannot ultimately determine at this stage whether the two promises are independent of one another; this in turn precludes the court from applying the warranty's limitation to manufacturing defects to both promises as a matter of law.

In sum, a genuine dispute exists as to the meaning of "UV resistant," the court cannot evaluate whether the manufacturing defect limitation applies to the UV-resistant promise, and summary judgment may not be granted on the 2004–06 Warranty.  *See Nomo Agroindustrial Sa De CV v. Enza Zaden N.A., Inc.*, 492 F. Supp. 2d 1175, 1177–78 (D. Ariz. 2007) (after reviewing manufacturer's express warranty that tomato seeds were resistant to Tomato Spotted Wilted Virus, denying summary judgment due to genuine dispute regarding definition of "resistant").

Metals attempts to narrow the scope of the "UV resistant" promise by asserting that this term is defined by the note the asterisk references, which explains "[a]t the date of installation, the coating will meet or exceed industry standards when tested to ASTM 4214 – 89 standards[8] given the service life of the roof."  DSUF 29.  But this argument has three problems.  First, the warranty creates a twenty-five year promise.  2004–06 Warranty at 1 ("[F]or a period of 25 years following proper installation, the surface coating of the Dura-Loc Product shall be UV resistant . . . .").  Only an exceptionally strained reading of the contract would conclude the twenty-five year promise ended on the date of installation, as Metals argues.  The court declines to adopt such an unreasonable interpretation.  Second, the asterisk references language that is expressly labeled as a "note."  DSUF 29.  A note does not a definition make. *Compare Note*, Merriam-Webster, https://www.merriam-webster.com/dictionary/note ("[A] brief comment or explanation."), *with Definition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/definition ("[A] statement of the meaning of a word or word group or a sign or symbol.").

Third, Metals's argument defies the common signal an asterisk sends.   As another judge has observed, an asterisk is merely "that little grammatical wink to imply that there is more

_____

[8] Neither party has proffered timely evidence regarding the meaning of these standards. Plaintiffs cite Harold Harlan's supplemental declaration, which asserts the ASTM standards do not apply to plaintiffs' tiles.  PSUF 184 (citing Harlan Suppl. Decl., ECF No. 105-9).  But that opinion, disclosed on September 30, 2016, was untimely given the court's supplemental expert disclosure deadline of May 28, 2016.  *See* ECF No. 89.  Accordingly, the court declines to consider it here.  *See* Fed. R. Civ. P. 26(a); Fed. R. Civ. P. 37(c)(1).  The court SUSTAINS Metals's objection to PSUF 184.  *See* Def.'s Objs. No. 2.

for the consumer to know and understand." *Chester v. TJX Cos., Inc.*, 515CV01437ODWDTB, 2016 WL 4414768, at *11 (C.D. Cal. Aug. 18, 2016); *see also United States v. Wadley*, 83 F.3d 108, 116 (5th Cir. 1996) (discussing the "accursed asterisk" allegedly next to Roger Maris' home run-record because of the additional games he had to beat Babe Ruth's record). Courts frequently interpret an asterisk in a contract merely to provide additional information. *See, e.g.*, *BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 289 (S.D.N.Y. 2013) (contract's double asterisk used to indicate the source of a reported national average statistic). Courts themselves use asterisks to provide additional information. *See, e.g.*, *Penuliar v. Gonzales*, 435 F.3d 961, 964 (9th Cir. 2006) (adding an asterisk to the caption tied to a footnote to indicate "Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States. . . ."). The Fifth Circuit specifically uses an asterisk to indicate missing information. *McCoy v. Mississippi State Tax Comm'n*, 3:09-CV-575 HTW-LRA, 2011 WL 8609554, at *1, n.9 (S.D. Miss. Feb. 8, 2011), *aff'd sub nom In re McCoy*, 666 F.3d 924 (5th Cir. 2012) (explaining Fifth Circuit's use of asterisk to cite to unnumbered, hanging paragraphs).

In certain circumstances, an asterisk can reference a definition. *See, e.g., United States v. Carroll*, 6 F.3d 735, 748 (11th Cir. 1993) ("The asterisk-designated note at the end of the table [] includes the following definition: 'Ice,' for the purposes of this guideline, means a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity."). Courts, however, are reluctant to find an asterisk references a definition where such an interpretation is unreasonable. *See, e.g., In re Cacciatori*, 465 B.R. 545, 552 (Bankr. C.D. Cal. 2012) (finding a credit application's use of an asterisk did not reference a definition where the note was at odds with the term purportedly defined); *First Mercury Ins. Co. v. Waterside Condo. Ass'n*, 3:12-CV-02348-ST, 2013 WL 6383883, at *11 (D. Or. Dec. 5, 2013) ("[I]t is not reasonable to strip meaning from most of the terms only to give meaning to the asterisk.").

Here, as discussed above, it would be unreasonable to construe the 2004–06 Warranty's "note" regarding the promise during installation as a definition. The asterisk merely references additional information. As a result, the court need not reach plaintiffs' argument that the ASTM 4214 - 89 standard does not apply to the types of tiles at issue here. *See* PSUF 184.

20

For now, it is sufficient to conclude plaintiffs' design defect claims under the 2004–06 Warranty are viable based on the warranty's guarantee that the tiles "shall be UV resistant." To the extent the tiles are not UV resistant, Metals may be liable for Dura-Loc's breach of warranty.

In sum, though all three warranties promise the product "will be UV resistant" and "will not deteriorate," plaintiffs and class members covered by the 2004–06 Warranty may not proceed on the second promise because it is limited to manufacturing defects. Plaintiffs and class members with the 2004–06 Warranty may proceed on the first promise if they can persuade a finder of fact it is independent of the second promise. In contrast, class members with the 1996–2000 or 2001–03 warranties may proceed under either promise because neither is limited to manufacturing defects. Because all three warranties remain viable, the court DENIES summary judgment on plaintiffs' design defect claims.

B.     Class Members' Compliance with the Warranty

Metals also moves for partial summary judgment on the warranty claims as to the named plaintiffs and class members that have submitted declarations in this action on the grounds that they did not comply with the warranty's procedural requirements, including registering the warranty, giving notice of claims, bringing timely suit, and paying service fees to file a claim. Mem. P. & A. at 26–28.

Metals's argument is unavailing because class members need not show their entitlement to relief at this stage. The court's class certification order specifically identified two questions not subject to common proof: individual compliance with the warranty terms and individual compliance with the statute of limitations. Cert. Order at 24. Affidavits or other proof of compliance could resolve these individual issues at a later stage of litigation. *Id.* Although plaintiffs submitted dozens of class member declarations, those declarations were offered only to support the requirements of class certification. *See* Pls.' Response to DSUF 49–121 ("Simply because [the class member] has not provided this information, because she has not been asked to do so, does not mean she cannot do so."). Because each class member, including the named plaintiffs, should have an opportunity to offer evidence and testimony of his or her compliance with the applicable warranty and statute of limitations, the court declines to consider whether the

previous declarations submitted for a different purpose adequately support those class members' right to relief.

In sum, because plaintiffs and class members still may be entitled to relief under the warranties, summary adjudication is DENIED on these grounds.

C.     Secondary Purchasers

Metals moves for partial summary judgment on plaintiffs' second claim under Commercial Code section 2313, as to the absent class members who are secondary purchasers of the tiles. Mem. P. & A. at 28–29. Metals argues secondary purchasers cannot show reliance on the manufacturer's warranty and their claims must therefore fail. *Id.*; Reply at 19.

Metals misstates the law relevant to plaintiffs' certified claim. Before California adopted the Uniform Commercial Code (UCC), plaintiffs alleging a breach of express warranty had to prove they relied on specific seller promises. *Hauter v. Zogarts*, 14 Cal. 3d 104, 115 (1975) (citing *Grinnell v. Charles Pfizer & Co.*, 274 Cal. App. 2d 424, 440 (1969)). But the UCC requires only that the seller's promises were "part of the basis of the bargain." *Id.* (citing Cal. Comm. Code § 2313). The *Hauter* court noted commentators disagreed over the impact of this new language: some argued it shifts the burden of proving non-reliance to the seller, others that it eliminates the concept of reliance altogether. *Id.* at 115–16. Without resolving the issue, the court criticized other states' decisions that held reliance is still a vital ingredient for recovery. *Id.* at 116 n.13.

Since *Hauter*, California courts have interpreted section 2313 as creating a presumption that the bargain was based on the seller's affirmations. *Weinstat v. Dentsply Int'l, Inc.*, 180 Cal. App. 4th 1213, 1227 (2010); *Keith v. Buchanan*, 173 Cal. App. 13, 23 (1985). Accordingly, the burden is on the seller to prove that the resulting bargain does not rest at all on the representation. *Weinstat*, 180 Cal. App. 4th at 1235; *Keith*, 173 Cal. App. at 23; *see also* UCC com. 3 to Cal. Comm. Code § 2313 (explaining "no particular reliance . . . need be shown in order to weave [the seller's affirmations of fact] into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof."). Thus, Metals first overstates plaintiffs' need to prove reliance. *See In re ConAgra*

*Foods, Inc.*, 90 F. Supp. 3d 919, 984 n.198 (C.D. Cal. 2015) (declining to follow authority that treated reliance as an element of a plaintiff's warranty claim because authority that so held relied on pre-UCC cases, including the case cited by Metals, *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682 (1954)). Second, Metals incorrectly attempts to place the burden on plaintiffs to show the warranty was "part of the basis of the bargain." *Weinstat*, 180 Cal. App. 4th at 1235; *Keith*, 173 Cal. App. at 23.

When, as here, the party moving for summary judgment bears the burden of proof at trial, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation and internal quotation marks omitted). Metals has not met its burden here. Instead, Metals incorrectly asserts plaintiffs have the burden to show reliance and then argues secondary purchasers cannot look to California Civil Code section 1797.94[9] to establish reliance. Mem. P. & A. at 28–29. Because Metals has not met its burden, the court need not address plaintiffs' reliance on section 1797.94.

Moreover, the only evidence Metals cites is the class members' declarations, which the court has already declined to consider. *Id.* at 17 (citing DSUF 98, 100, 103, 106, 113). Particularly because it is Metals's burden to show its warranty was not a "part of the basis of the bargain" for secondary purchasers, the court here as well concludes class members should have an opportunity to demonstrate their right to relief at trial. *Cf. Hardage Hotels X, LLC v. First Co.*, D053980, 2010 WL 1512138, at *12 (Cal. App. 4th Dist. Apr. 16, 2010) (affirming a directed verdict in favor of the manufacturer where, based on evidence presented at trial, remote purchasers became aware of the existence of the warranty long after purchasing the product).

In sum, plaintiffs may continue with their design defect claims under all three warranties. In addition, because they need not individually demonstrate their right to relief at this

---

[9] California Civil Code section 1797.94 provides in relevant part "[a]ny warranty subject to [Chapter 5. Home Roof Warranties], shall inure to the benefit of, and shall be directly enforceable by, all subsequent purchasers and transferees of the residential structure, without limitation, unless the warranty contains a provision limiting transferability of the warranty."

stage, plaintiffs may later show compliance with their warranty terms and that the warranty was a "basis of the bargain."  The court DENIES partial summary judgment on these grounds.

V.     <u>CONCLUSION</u>

The court DENIES Metals's motion for summary judgment and, in the alternative, for partial summary judgment.

This order resolves ECF No. 102.

IT IS SO ORDERED.

DATED:  July 12, 2017.

_____
UNITED STATES DISTRICT JUDGE