UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WILSON, an individual, and JACK WHITE, an individual, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> METALS USA, INC., a Delaware Corporation, and DOES 1–100, inclusive, <br><br> Defendants. | No. 2:12-cv-00568-KJM-DB <br><br><br> <u>ORDER</u> |

    Plaintiffs James Wilson and Jack White have brought this certified class action alleging that roofing tiles manufactured by Dura-Loc Roofing Systems Limited ("Dura-Loc") suffer from an inherent design defect, which results in the deterioration of the tiles' outer coating upon exposure to air and sunlight. *See generally* Third Am. Compl. ("TAC"), ECF No. 78. They bring this action against defendant Metals USA, Inc. ("Metals"), the alleged successor to Dura-Loc's liability. Plaintiffs' unopposed motion for preliminary approval of the proposed class action settlement is before the court. ECF No. 140. The court held a hearing on the matter on October 19, 2018, at which Richard Lambert appeared for plaintiffs and Adrian Sawyer and Cole Ramey appeared for defendant. As explained below, the court GRANTS the motion.

///

///

1

I.       BACKGROUND

   A.      Factual Background

         1.      Dura-Loc's Tiles

         Dura-Loc started its business in Ontario, Canada, in 1984. Reid Decl., TAC Ex. D ¶ 15, ECF No. 78-4. Between 1985 and 2006, Dura-Loc manufactured stone-coated steel roofing tiles. *Id.* The metal tiles' top sides, the side exposed to the elements, were coated with crushed stone chips, granules of "Colorquartz Aggregate." *See* Dalton Decl. (Class Cert.) Exs. B & D, ECF No. 82-2. In May 2006, Metals purchased Dura-Loc's assets. Asset Purchase Agreement ("APA"), TAC Ex. H, ECF No. 78-8. After the asset sale, Dura-Loc ceased manufacturing, marketing and selling the tiles and changed its named to 604471 Ontario, Inc. Reid Decl. ¶ 14.

         2.      Plaintiffs' Warranty Claims

         In June 2004, named plaintiffs James Wilson and Jack White purchased Dura-Loc roofing tiles for their homes in Roseville and Orangevale, California, respectively. Wilson Decl. ¶ 2, ECF No. 81-10; White Decl. ¶ 2, ECF No. 81-16. Plaintiffs allege they purchased the tiles in reliance on Dura-Loc's express written warranty that the tiles would be UV resistant and not deteriorate for a period of at least twenty-five years after installation. Wilson Decl. ¶ 2; White Decl. ¶ 2. In or about June 2011, named plaintiffs noticed the tiles had deteriorated and lost much of their color, coating and texture. Wilson Decl. ¶¶ 4–5; White Decl. ¶¶ 4–5.

         Plaintiffs allege Dura-Loc's warranty was false, and contrary to the warranty's terms, the tiles suffer from an inherent defect known as "degranulation," whereby the bonding material used to adhere the Colorquartz granules to the surface of the tile degrades upon exposure to UV rays, ultimately causing the stone-coated portion of the tile to detach from the metal substructure. TAC ¶ 30. Plaintiffs allege this defect caused the tiles to deteriorate, losing their stone coating and granular texture, as well as their original color, well in advance of the warranted twenty-five years. *Id.* Plaintiffs further allege Dura-Loc never disclosed the defective nature of the tiles, despite being under a duty to do so. *Id.* ¶ 31. Finally, plaintiffs allege that while Dura-Loc designed and manufactured the tiles, defendant Metals purchased Dura-Loc's

assets in 2006 and is therefore liable for the acts and omissions of Dura-Loc under the theory of successor-in-interest liability. *Id.* ¶¶ 47, 152, 162, 175, 181.

Based on these allegations, plaintiffs bring the following claims on behalf of the class: (1) breach of express warranties under California Civil Code §§ 1790 *et seq.*; (2) breach of express warranties under California Commercial Code §§ 2313 *et seq.*; (3) violations of the California Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.*; and (4) violations of California Unfair Competition Law, California Business & Professions Code § 17200. *See generally* TAC.

B.  Procedural History

Plaintiffs filed their original complaint on March 5, 2012, against 604471 Ontario Inc., a Canadian corporation formerly known as Dura-Loc Roofing Systems Limited, and Allan Reid, a principal of Dura-Loc. Compl. at 1–2, ECF No. 1. After Dura-Loc filed for bankruptcy in Canada in April 2012, plaintiffs filed a first amended complaint on May 5, 2012, against defendant Metals, the alleged successor-in-interest of Dura-Loc, and Reid. First Am. Compl. ("FAC") at 9 n.2, ECF No. 11. Metals moved to dismiss for failure to state a claim on July 9, 2012, asserting plaintiffs did not adequately allege Metals was liable under the fraudulent transfer theory of successor liability, and Reid moved to dismiss for lack of personal jurisdiction on August 18, 2012. ECF Nos. 15, 22. The court granted Metals's motion, ECF No. 31, and *sua sponte* dismissed the complaint for failure to join 604471 Ontario, Inc. as a necessary party, ECF No. 34. Plaintiffs filed a second amended complaint on May 8, 2013, against defendant Metals only. Second Am. Compl. ("SAC"), ECF No. 49. The court denied Metals's motion to dismiss this complaint. ECF Nos. 50, 57.

Plaintiffs filed the operative Third Amended Complaint on June 29, 2015. TAC, ECF No. 78. On July 5, 2016, the court granted plaintiffs' motion for class certification of their

///

///

///

claim for breaches of express warranty under California Commercial Code § 2313. Mot. Class Cert., ECF No. 81; Cert. Order, ECF No. 93. Specifically, the court certified the following class:

> All individuals and entities that own homes or other structures located in the State of California on which Dura-Loc Roofing Systems Limited's Continental, Shadowline, or Wood Shake stone coated steel roof shingles were installed during the period of time beginning July 1, 1996 through May 12, 2006.

Cert. Order at 25.

On September 2, 2016, defendant filed a motion for summary judgment or, in the alternative, partial summary judgment on plaintiffs' express warranty claims. Mot. Summ. J., ECF No. 102. Plaintiffs opposed the motion, ECF No. 105, and defendant replied, ECF No. 106. After a hearing, the court denied defendant's motion on July 12, 2017. ECF No. 124.

Plaintiffs filed the instant unopposed motion for preliminary approval of the class action settlement on August 31, 2018. Mot., ECF No. 140-1.

II. LEGAL STANDARD

"Courts have long recognized that 'settlement class actions present unique due process concerns for absent class members.'" *In re Bluetooth Headset Prods. Liab. Litig.* (*Bluetooth*), 654 F.3d 935, 946 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). In settlement cases, the class's motivations may not perfectly square with those of its attorneys. *See id.* An attorney representing a settlement class may be tempted to accept an inferior settlement in return for a higher fee. *Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002). Likewise, defense counsel may be happy to pay his counterpart a bit more if the overall deal is better for his client. *See id.*

To protect absent class members' due process rights, Rule 23(e) of the Federal Rules of Civil Procedure permits a class action to be settled "only with the court's approval" "after a hearing and on a finding [that the agreement is] fair, reasonable, and adequate." To assess the fairness of a proposed settlement, courts consider several factors, including: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6)

4

the experience and view of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015) (quoting *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). The court must also consider the value of the settlement offer and whether the settlement is the result of collusion. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992).

As the Ninth Circuit has recognized, however, the "governing principles are clear, but their application is painstakingly fact-specific," and the court normally stands as only a spectator to the parties' bargaining. *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). "Judicial review also takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk." *Id.* Federal courts have long recognized "[a] strong judicial policy favors settlement of class actions." *Adoma v. Univ. of Phoenix, Inc.*, 913 F Supp. 2d 964, 972 (E.D. Cal. 2012) (citing *City of Seattle*, 955 F.2d at 1276).

As a functional matter, a "[r]eview of a proposed class action settlement generally involves two hearings." Ann. Manual for Complex Litigation, Fourth ("MCL") § 21.632 (2004). First, the court conducts a preliminary fairness analysis and, if necessary, a preliminary class certification analysis. *Id.*; *see Bluetooth*, 654 F.3d at 946. Second, after all absent class members are notified of the certification and proposed settlement, the court holds a final fairness hearing where it revisits class certification and determines whether to approve the settlement. MCL §§ 21.632–21.635; *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1267 (9th Cir. 2010). Here, the court undertakes the first, preliminary step only.

III. DISCUSSION

    A. Preliminary Fairness Determination

At the preliminary approval stage, courts often consider only whether the proposed settlement "(1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval."

*Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 319 (C.D. Cal. 2016) (citations omitted). To the extent this analysis may be less rigorous than the *Churchill* inquiry described above, this court recently has clarified it agrees with the observation of another California district court that "the idea that district courts should conduct a more lax inquiry at the preliminary approval stage seems wrong" and lacks any compelling rationale. *See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035–36 (N.D. Cal. 2016). Rather, in light of the court's duty to absent class members, the court should "review class action settlements just as carefully at the initial stage as [it] do[es] at the final stage." *See id.* at 1037; *see also Stoddart v. Express Servs.*, No. 2:12-cv-01054-KJM-CKD, 2019 WL 414489, at *5 (E.D. Cal. Feb. 1, 2019) (stating this court's agreement with the principle set forth in *Cotter*); *Smothers v. Northstar Alarm Servs., LLC*, No. 2:17-cv-00548-KJM-KJN, 2019 WL 280294, at *10 (E.D. Cal. Jan. 22, 2019) (same).

At the preliminary approval stage, the "initial evaluation can be made on the basis of information [contained in] briefs, motions, or informal presentations by parties," MCL § 21.632, and "the [c]ourt need not review the settlement in detail." *Durham v. Cont'l Cent. Credit, Inc.*, No. 07cv1763, 2011 WL 90253, at *2 (S.D. Cal. Jan. 10, 2011) (citing Newberg § 11.25). The court may not "delete, modify or substitute certain provisions." *Hanlon*, 150 F.3d at 1026 (citations and quotation marks omitted). "The settlement must stand or fall in its entirety." *Id.*

With these principles in mind, the court turns to the Settlement Agreement and plaintiffs' motion.

### 1. The Proposed Settlement Agreement

As noted above, the court has certified the following class:

> All individuals and entities that own homes or other structures located in the State of California on which Dura-Loc Roofing Systems Limited's Continental, Shadowline, or Wood Shake stone coated steel roof shingles were installed during the period of time beginning July 1, 1996 through May 12, 2006.

Cert. Order at 25. Under the proposed Settlement Agreement, defendant agrees to pay a gross amount of $2,800,000 for all claims. Mot. at 5; Settlement Agreement § 1.41, ECF No. 140-3. The agreement further provides defendant shall make the following payments separate and apart

from the gross settlement payment of $2,800,000: (1) settlement administration expenses; (2) attorney's fees and costs, not to exceed $1,111,000; and (3) incentive awards for each representative plaintiff, as approved by the court, not to exceed $39,000 in aggregate. Mot. at 6–7; Settlement Agreement §§ 1.19, 1.41, 8.1.

The settlement will be allocated to class members using the following distribution formula: Each member of the Settlement Class may claim up to 300 affected tiles, each valued at $10.00, for a maximum claim of $3,000 ($10.00 x 300 = $3,000.00). Mot. at 5; Settlement Agreement § 7.6.[1] Should the total value of the claims exceed $2,800,000, the value of each affected tile shall be decreased on a pro rata basis. Mot. at 5; Settlement Agreement § 7.9. To be eligible to receive payment from the settlement, a class member must submit a claim form by mail or through the settlement website by the submission deadline. Settlement Agreement § 7.2. The settlement payment will be made available on a reversionary basis, with defendant retaining unclaimed funds. *Id.* § 2.1. Additionally, if class members do not cash their settlement checks within ninety days of receiving them, those sums shall be returned to defendant. *Id.* § 7.12.

The Settlement Agreement contemplates a notice period for class members to opt out of the settlement or to file an objection regarding its fairness. Mot. at 16–17; Settlement Agreement §§ 5–6. A settlement administrator will send a summary notice to all putative class members. Mot. at 16; Settlement Agreement § 5.2. The settlement administrator will also provide publication notice through targeted publication and direct class members to the settlement website, which will contain the full notice, as well as copies of plaintiffs' operative complaint and the court's preliminary approval order. Mot. at 16; Settlement Agreement §§ 5.3–4. Once notice is sent out, class members are automatically part of the settlement unless they opt out of the settlement by the opt-out deadline. Mot. at 7; Settlement Agreement § 6.2. Class members may

---

[1] At hearing plaintiffs' attorney explained the $3,000 figure is based on a square footage number, estimating approximately $2 per square foot with a five-square-foot tile to get to $10 a tile. *See* Hrg. Trans. at 6:21–7:25. The warranty associated with UV resistance does not reference a monetary figure but rather simply uses the language of the "original cost of product." ECF Nos. 78-1, 78-5, 78-6.

7

also file objections to the settlement and subsequently appear at the second fairness hearing. Mot. at 7; Settlement Agreement § 6.1.

### 2. Fairness, Reasonableness, and Adequacy

As noted above, at this preliminary approval stage, the court considers whether the proposed settlement appears to be "the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citations and quotation marks omitted). Courts often begin by examining the process that led to the settlement's terms to ensure that those terms are the result of vigorous, arms-length bargaining and then turn to the substantive terms of the agreement. *See id.* at 1080 ("[P]reliminary approval of a settlement has both a procedural and a substantive component.").

Here, the court finds the Settlement Agreement offers genuine relief in the form of payments capped at $3,000 per class member. The parties, moreover, reached agreement just before trial after more than six years of litigation, thereby assuring they entered into the Settlement Agreement with a substantial grasp of the strengths and weaknesses of the case. The risks and uncertainty associated with continued litigation also weigh in favor of approving the settlement, as does the fact the parties engaged in substantial discovery and mediation. Therefore, the proposed agreement here satisfies the requirements for preliminary approval. Nevertheless, the court expresses very strong reservations about several aspects of the fairness of the proposed settlement and warns the parties that the court will not grant final approval if these concerns are not resolved by the time of the final hearing on whether to approve the settlement. These reservations are discussed in detail below.

#### a. Settlement Process

First, that the parties reached a settlement agreement after more than six years of adversarial litigation, contentious arm's-length negotiations, and four all-day mediations before two experienced mediators supports granting preliminary approval. *See* Lambert Decl. (Prelim. Approv.), ¶¶ 5–6, ECF No. 140-3. Participation in mediation "tends to support the conclusion

8

that the settlement process was not collusive." *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012); *see also Gribble v. Cool Transps. Inc.*, No. CV 06-04863-GAF-(SHx), 2008 WL 5281665, at *9 (C.D. Cal. Dec. 15, 2008) (settlements negotiated at arm's length are presumed fair). Plaintiffs' counsel declares that, prior to mediation, the parties "engaged in substantial written discovery, depositions, third party discovery, expert discovery, and absent Settlement Class member discovery." Lambert Decl. ¶ 3. Plaintiffs' counsel further states the parties' decision to accept a settlement accounts for "the real and substantial risks of continued litigation." *Id.* ¶ 13. These circumstances favor approval.

           b. Substance of the Agreement

    The court next considers the substance of the agreement to determine whether the settlement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *9 (N.D. Cal. 2011) (internal citation and quotation marks omitted). This inquiry may involve consideration of the uncertainty class members would face if the case were litigated to trial. *See Ontiveros v. Zamora*, Civ. No. 2:08-567 WBS DAD, 2014 WL 3057506, at *14 (E.D. Cal. July 7, 2014).

    Here, plaintiffs assert the proposed settlement provides a fair and substantial value to the individual class members "given the nature of this Litigation, its anticipated risk, expense, and uncertainty." *See* Mot. at 12–14. Plaintiffs estimate defendant's maximum potential liability under the terms of the Asset Purchase Agreement with Dura-Loc to be $4,025,000 for warranty claims on all Dura-Loc products sold prior to 2006. Mot. at 14; Lambert Decl. ¶¶ 19–20. The settlement amount of $2,800,000 thus equals 69.6 percent ($2,800,000/$4,025,000) of defendant's maximum potential liability exposure, as calculated by plaintiffs. Mot. at 14; Lambert Decl. ¶ 21. This amount will be distributed to the approximately 1,000 putative class members identified by plaintiffs who do not opt out of the settlement. Plaintiffs further assert the settlement is a "phenomenal result," because $4,025,000 represents the maximum defendant was obligated to expend on warranty claims for all affected tiles sold by Dura-Loc over the twenty-five years prior

to the Asset Purchase Agreement, all over the world and not exclusively in California. Mot. at 13–14; Lambert Decl. ¶ 21.

Given the estimated potential recovery, the court preliminarily finds the settlement to be a fair outcome. While the court notes with concern the wide discrepancy between the sum of $9,400,000 plaintiffs sought going into mediation and the resulting maximum settlement sum of $2,800,000, the court acknowledges that if the case were to continue, the outcome for plaintiffs is uncertain. In explaining how the parties reached their settlement figure, plaintiffs' counsel states there are "a number of obstacles" to prevailing at trial on the issues of maintaining class certification and liability; specifically, whether: "(i) [plaintiffs could prove] there was [a] common design defect; (ii) individual compliance with the warranty could be proven on a class-wide basis or was otherwise irrelevant . . .; and (iii) the extent and amount (if any) [defendant] may be held liable under the fraudulent exception theory to successor liability." Lambert Decl. ¶¶ 15–16. Plaintiffs' counsel further declares defendant "would appeal any adverse judgment," Lambert Decl. ¶ 11, and asserts the settlement "presents a fair and reasonable alternative to continuing the litigation," *id.* ¶ 13.

Considering these uncertainties and that "[g]reat weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation," the court makes a preliminary finding that the settlement amount is within the range of possible approval. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal quotations and citation omitted). But the court will further scrutinize the discrepancy noted above before any final approval. *Cf. Beidleman v. City of Modesto*, No. 1:16-cv-01100-DAD-SKO, 2018 WL 1305713, at \*3 (E.D. Cal. Mar. 13, 2018) (scrutinizing discrepancy between demand and settlement at final approval; ultimately noting demand was overstated and finding settlement fair given "the complexity of this case and the difficulty the parties face in estimating the likely value of plaintiffs' claim without conducting an exact calculation").

///

///

10

### c. The Court's Reservations

As noted above, while the court grants preliminary approval, it expresses strong and serious reservations about several aspects of the fairness of the proposed settlement. Specifically, the court finds it difficult to determine the ultimate reasonableness of the settlement given the lack of information provided to date concerning (1) the amount of incentive payments for named plaintiffs, (2) the reversionary nature of the settlement, (3) the pro rata decrease to each class member's payment if too many persons file claims, and (4) the claims for attorney's fees. The court cautions that final approval will require more information addressing these concerns and is conditioned on the court's careful review and acceptance of the actual proposed distribution of funds based on claimants' responses to the notice to be provided. The court's acceptance at this point cannot be guaranteed.

#### i. Incentive Payments

First, the agreement provides that named plaintiffs Wilson and White may apply for incentive awards of up to $25,000 and $14,000, respectively, paid separate and apart from payments to the class. Mot. at 7; Settlement Agreement §§ 1.19, 2.3. The court "must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013). In particular, incentive awards disproportionate to the recovery of individual class members may "corrupt the settlement by undermining the adequacy of the class representatives." *Id.*; *see also Staton*, 327 F.3d at 975–78 (reversing district court's approval of class action settlement when incentive award sixteen times larger than damages award to unnamed class members not justified). Here, individual class members are entitled to receive no more than $3,000 under the settlement, while the named plaintiffs may apply for incentive awards up to 8.3 and 4.7 times that amount. Settlement Agreement § 7.6. Moreover, named plaintiffs have not submitted any information describing their involvement in the litigation or otherwise justifying the incentive awards. At hearing, plaintiffs' counsel characterized the incentive awards as reflecting the amount of money plaintiffs spent on defective roofing tiles for their homes. Counsel also asserted that named plaintiffs assisted the litigation by submitting their roofs to inspection and

participating in discovery. While the court acknowledges these assertions and that the agreement is not contingent on the awards, final approval, if granted, will require more substantial justification than plaintiffs have thus far provided, detailing and documenting the basis for these disproportionate awards.

### ii. Reversionary Nature of the Settlement

Second, the court expresses its significant concern regarding the reversionary nature of the settlement payment. Under the proposed agreement, unclaimed settlement funds revert to the defendant. Settlement Agreement § 2.1. "Claims made settlements with reversions to a defendant are strongly disfavored." *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015). "If unclaimed funds are to revert to a defendant the parties should explain why those funds should revert to Defendant." *Id.* At hearing, plaintiffs' counsel described the settlement as essentially fulfilling Dura-Loc's warranty on the roofing tiles, equating the distribution of settlement payments on a claims-made basis to paying warranty amounts as they came due, and therefore asserted it is fair to allow unclaimed funds to revert to defendant. As plaintiffs' counsel explained, however, it is difficult to estimate what percentage of putative class members will submit claim forms. "Relatively low interest in the settlement does not mean that Defendant should receive a windfall benefit as a result of absent class members failing to submit claims." *La Parne v. Monex Deposit Co.*, No. SACV 08-0302 DOC (MLGx), 2010 WL 4916606, at *4 (C.D. Cal. Nov. 29, 2010). Therefore, at the final approval stage with final proposed numbers in hand the parties must be prepared to more fully develop their justifications for the court's permitting defendant to retain unclaimed funds, providing clear information on the total amount of any windfall and any other information to place any windfall in a context demonstrating its fairness or unfairness. The court strongly warns that if, after notice has been completed and the deadline for filing settlement claims has passed, defendants stand to receive a windfall from the reversion, the court is unlikely to grant final approval.

///

///

///

12

### iii. Pro Rata Decrease of Settlement Payments

Third, the court is troubled by the proposed potential for a pro rata decrease in individual settlement amounts if too many people file claims. The Settlement Agreement provides the maximum total settlement amount defendant shall be required to pay is $2,800,000. Settlement Agreement §§ 1.41, 2.1. Therefore, if the aggregate sum of the individual settlement claims, at $10.00 per roofing tile up to 300 tiles, exceeds $2,800,000, each class member's settlement payment shall be reduced on a pro rata basis so the total amount paid does not exceed $2,800,000. Settlement Agreement §§ 7.6, 7.9. Because the Settlement Agreement caps the amount of defendant's total liability, if many more than the expected number of people file settlement claims, there will be pro rata reductions to claim payouts and each class member could receive very little compensation. While the court reserves judgment until the filing period has elapsed, and the record is clarified in connection with a final approval hearing, this potential pro rata reduction raises a red flag regarding whether the settlement fairly and adequately "compensates class members for the wrongs they suffered." *Bluetooth*, 654 F.3d at 946.

### iv. Attorney's Fees

Fourth, although the court preliminarily approves the attorney's fee provision entitling class counsel to request fees and costs up to $1,111,000, the court notes here as well its strong reservations about "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947 (citing *Staton*, 327 F.3d at 960). The agreement provides for a disproportionate payment of attorney's fees and costs separate from payments to the class. *See* Settlement Agreement §§ 2.3, 8.1. Further, if the court ultimately declines to award the maximum award of fees and costs authorized by the Settlement Agreement, defendant will retain the difference. *See* Settlement Agreement § 2.3. The court is concerned that the combined features of the proposed settlement— the disproportionate award, clear sailing provision, and reversion arrangement–signal collusion. *See Bluetooth*, 654 F.3d at 947. Additionally, before approving any final request for attorney's fees, plaintiffs must justify the fees amount under a percentage-of-recovery theory or a lodestar method. *Id.*

1 | Generally, courts have discretion to use either the percentage-of-the-fund or the
2 | lodestar method in considering the propriety of an attorney's fees award in a class action
3 | settlement. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). "Though
4 | courts have discretion to choose which calculation method they use, their discretion must be
5 | exercised so as to achieve a reasonable result." *Bluetooth*, 954 F.3d at 942 (citing *In re
6 | Coordinated Pretrial Proceedings*, 109 F.3d 602, 607 (9th Cir.1997)). Whatever method courts
7 | use to calculate fees, the Ninth Circuit recommends "cross-checking their calculations against a
8 | second method." *Bluetooth*, 654 F.3d at 944.

Because this is not a common fund case and attorney's fees will be assessed against defendant without reducing the relief available to the class, it appears the lodestar method is the appropriate method for determining whether the attorney's fees provision at issue is reasonable at this stage. *Hanlon*, 150 F.3d at 1029–30 (affirming district court's use of the lodestar method when calculation of the common fund was uncertain); *see also Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-cv-05437, 2008 WL 1901988, at *1 (W.D. Wash. Apr. 24, 2008) ("Where, as here, Settlement relief will be paid on a claims made basis with no cap to the relief available, consideration of attorneys' fees lends itself more readily to the lodestar method. Because the attorneys' fees will be paid separately by [defendant] without reducing the relief available to the Class, the lodestar method is appropriate.").

Plaintiffs' counsel contends their lodestar figure is $1,400,000. Mot. at 7; Lambert Decl. ¶ 9. Based on documentation provided by plaintiffs' counsel and the substantial duration and uncertainty of this litigation, as well as the potential for genuine immediate benefit to be obtained for the class by the settlement, the court preliminarily concludes the reportedly discounted amount of $1,111,000 is a reasonable upper limit on the amount plaintiffs' counsel may receive as attorney's fees under the settlement. The court cautions, however, that plaintiffs must provide more information concerning the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment before the court grants final approval. *See Hanlon*, 150 F.3d at 1029. Therefore, along with the parties' final approval filings with the court, plaintiffs shall submit detailed billing records and an

explanation of counsel's hourly rate so the court may determine whether the lodestar figure is reasonable and appropriate in this case.

The court notes that a percentage-of-the-fund crosscheck reinforces its concern about the fee award at this preliminary approval stage. If the court were to consider the estimated maximum settlement payout of $2,800,000 to be a putative common fund, $1,111,000 would be approximately 40 percent of that fund. This figure greatly exceeds the 25 percent benchmark and falls well outside the range of potentially reasonable awards accepted by the Ninth Circuit when the risks and complexities involved in a case are considered. *See Vizcaino*, 290 F.3d at 1047 (referring to 20–30% as the "usual range" of attorney's fee awards). Given this disproportionate fee award, and the fact that if the court reduces the award the difference will revert to defendant, the court strongly warns the parties to address its concerns before the court rules on final approval of the requested fee award.

B. <u>Notice</u>

For any class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). The notice must state in plain, easily understood language:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*Id.*

The court has reviewed the proposed notice, Settlement Agreement Exs. B, C, ECF No. 140-3, and finds it conforms with due process and Rule 23(c)(2)(B). The proposed notice provides sufficient information for putative class members to assess whether they are

included in the class and to gauge the value of their claims. The notice also adequately describes the terms of the settlement, informs the class about the allocation of attorney's fees and incentive awards, and, once completed, will provide specific and sufficient information regarding the date, time, and place of the final approval hearing. *See Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1126–27 (E.D. Cal. 2009). It informs recipients how they may object or opt out of the proposed settlement. The proposed mode of delivery, by mail or by email, also appears appropriate in these circumstances.

IV. CONCLUSION

The court GRANTS preliminary approval of the class settlement and GRANTS approval of the proposed notice to the putative class. The court APPOINTS Kurtzman Carson Consultants LLC as claims administrator.

The court adopts the parties stipulated schedule, ECF No. 146, as follows:

(1) Within two days of this order, class counsel must submit the class list to the claims administrator;

(2) Within thirty-two days of this order, the claims administrator must (a) mail the summary notice, (b) publish the publication notice, and (c) post the full notice, plaintiffs' third amended complaint, a copy of this order, and the claim form on the settlement website;

(3) Within eighty days of this order, plaintiffs must file their anticipated motion to approve attorney's fees and costs, administration expenses, and incentive awards;

(4) Within three days of the filing of the motion for attorney's fees and costs, administration expenses and incentive awards, the claims administrator must post the motion on the settlement website;

(5) Within ninety-four days of this order, class members must postmark their claim forms, objections to the settlement, or requests for exclusion;

(6) Plaintiffs must file their motion for final approval of the class action settlement no earlier than 150 days after the entry of this order; and

(7) The final hearing on whether to approve the settlement will be held no earlier than twenty-eight days after the filing of the motion for final approval of the class action settlement, with the hearing date set by plaintiffs upon the filing of the motion.

IT IS SO ORDERED.

DATED: March 12, 2019.

_____
UNITED STATES DISTRICT JUDGE